J. Skelly Wright, Circuit Judge, filed a dissenting opinion.

Mary Pat LAFFEY, et al.

v.

NORTHWEST AIRLINES, INC.,
Appellant

Air Line Pilots Association, Non-Aligned Party. (Two cases)

Mary Pat LAFFEY, et al., Appellants

v.

NORTHWEST AIRLINES, INC.

Nos. 83–1838, 83–1839 and 83–1896.

United States Court of Appeals,
District of Columbia Circuit.

Argued 12 April 1984.

Decided 28 Sept. 1984.

Philip A. Lacovara, Washington, D.C., with whom William R. Stein, Washington, D.C., was on the brief for Northwest Airlines, Inc., appellant in Nos. 83–1838 and 83–1839 and for cross-appellee in No. 83–1896.

Rebecca L. Ross, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for United States, amici curiae in Nos. 83–1838, 83–1839 and 83–1896, urging reversal.

Daniel A. Rezneck, Washington, D.C., with whom Michael H. Gottesman and Robert M. Weinberg, Washington, D.C., were on the brief for Laffey, et al., appellees in Nos. 83–1838 and 83–1839 and for cross-appellants in No. 83–1896.

John H. Pickering, Washington, D.C., with whom Gary D. Wilson, Washington, D.C., Fred N. Fishman, New York City, Robert H. Kapp, William L. Robinson and Norman J. Chachkin, Washington, D.C., were on the brief for Lawyers' Committee for Civil Rights Under Law, amicus curiae in Nos. 83–1838, 83–1839 and 83–1896, urging affirmance.

Before WRIGHT, TAMM and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

Dissenting opinion filed by Circuit Judge J. SKELLY WRIGHT.

**WILKEY, Circuit Judge:**

Northwest Airlines, Inc., appeals from an award of $3,453,779.49 in attorneys fees and costs to counsel for plaintiffs. We find that the district court abused its discretion in calculating the fee award. Accordingly, we reverse and remand.

## I. FACTS

This case involves a dispute over the amount of attorneys fees due the plaintiffs as prevailing party in a complex and long-standing employment discrimination suit. The suit on the merits began in 1970. Acting on behalf of more than 3,300 women employed by Northwest Airlines, Inc., the plaintiffs challenged various personnel management practices of Northwest under Title VII and the Equal Pay Act.

In 1973 the trial court essentially adopted the legal arguments urged by the plaintiffs, and issued an order in their favor.[1] In 1976 a panel of this court sustained the trial court's statutory interpretation, but remanded for reconsideration of the proper remedy. This court denied rehearing en banc in 1977, and in 1978 the Supreme Court declined to issue a writ of certiorari. Upon remand, the district court awarded $52 million in compensatory relief, as well as significant injunctive relief.[2] That ruling has been affirmed in principal part by another panel of this court.[3]

Following the close of litigation on the merits, the fee application process began in earnest. In June of 1982 the district court ordered counsel to commence negotiations on the attorneys fees.[4] Bredhoff & Kaiser, the attorneys for the plaintiffs throughout the merits phase of this litigation, retained Daniel Rezneck of Arnold & Porter to negotiate and, if necessary, litigate the attorneys fee award.[5]

In November 1982 the parties reported to the court that their negotiations had been fruitless.[6] Litigation over the size of the fees began. Pursuant to a timetable presented by the parties and approved by the trial court, the parties entered several months of simultaneous discovery. During this period the attorneys for the plaintiffs sought to discover the fees received by the counsel for the defense; the court refused to compel discovery of this information.

The plaintiffs subsequently requested just over $5 million to cover all attorneys fees and expenses from 15 July 1970 to 15 July 1983; the defendants proposed an award of just over $1 million. In reaching these rather divergent figures, both plaintiffs and defendants relied on the "lodestar" approach adopted by this Court in *Copeland v. Marshall*,[7] setting separate lodestar figures for the litigation on the merits and the litigation on the attorneys fees.[8] Both sides supplemented their proposals with copious appendices, exhibits, affidavits, charts, and summaries.[9]

---

1. *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 437 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) (*"Laffey I"*).
   This court has heard aspects of this case on three other occasions. In 1980 a panel of this court declined to modify an injunction issued by the district court. *Laffey v. Northwest Airlines, Inc.*, 642 F.2d 578, 580 (D.C.Cir.1980) (*"Laffey II"*). The appeal in *Laffey I* also resulted in a separate published opinion relating to plaintiffs' entitlement to costs. *Laffey v. Northwest Airlines, Inc.*, 587 F.2d 1223 (D.C.Cir.1978) (per curiam).
   Finally, on 20 July 1984, this court issued an opinion intended to serve as the circuit's "closing chapter" on the merits of the controversy. *Laffey v. Northwest Airlines, Inc.*, Nos. 740 F.2d 1071 (D.C.Cir.1984) (*"Laffey III"*).

2. *Laffey v. Northwest Airlines, Inc.*, 582 F.Supp. 280, 32 Fair Empl.Prac.Cas. (BNA) 758 (D.D.C.

1982), *aff'd in part and rev'd in part*, 740 F.2d 1071, 35 Fair Empl.Prac.Cas. (BNA) 508 (D.C. Cir.1984).

3. *See Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071.

4. *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 360 (D.D.C.1983).

5. *Id.*

6. *Id.*

7. 641 F.2d 880 (D.C.Cir.1980) (en banc).

8. 572 F.Supp. at 360–61.

9. *Id.* at 360. The fees suggested by the parties to the litigation are as follows:

### A. Proposed Fee for Litigating the Merits

Both plaintiffs and defendants substantially agreed on the number of hours "reasonably expended" in the litigation on the merits. The defendants raised two objections to the quantity of hours—a request for 160.5 hours logged by an attorney who was not a member of the firm but who did attend the trial and assist the Bredhoff & Kaiser attorneys,[10] and an objection to 254.-25 attorney hours spent on allegedly non-compensable issues.[11] Both sides agreed to the validity of the remaining 10,929.50 hours expended on the merits.

The parties differed radically, however, on how the reasonable hourly rates should be set. The defendants proposed figures based on the hourly rates *actually charged* by Bredhoff & Kaiser attorneys *in similar cases.* The defendants then invited the court to examine whether certain work done by partners could have been done by associates or even paralegals,[12] and to compensate that work at lower rates if "partner-level" expertise had not been required.[13] The plaintiffs proposed rates intended to reflect a *"prevailing community rate"*[14]—a rate, as it happened, *substantially exceeding* that ordinarily charged by Bredhoff & Kaiser attorneys. The plaintiffs substantiated the validity of this rate with voluminous affidavits from their own and other area attorneys.

The parties thus proposed significantly different lodestar figures for the merits. The plaintiffs sought a merits lodestar of $1,494,450.80. The defendants proposed a merits lodestar of $903,875.15.[15]

The plaintiffs then proposed two separate 100 percent multipliers of the merits lodestar—one to account for the quality of the work performed, and another to account for the contingency of payment.[16] The defendants proposed no multiplier at all.[17] With these multipliers taken into account, the plaintiffs sought $4,483,352.40 as attorneys fees for the litigation on the merits.

### B. Proposed Fee for Litigating the Attorneys Fees Award

The parties also differed radically on the proper award for litigating the attorneys fee issue. Laffey sought compensation for 2,579 hours spent by Bredhoff & Kaiser

| BREDHOFF & KAISER | Laffey's Proposal | NWA's Proposal |
|---|---|---|
| Merits Issues | | |
| Fees: Lodestar | $1,494,450.80 | $ 903,875.15 |
| 200% Adjustment | 2,988,901.60 | ["very modest" contingency increase] |
| Expenses: Paralegals/Clerks | 76,290.15 | 76,065.00 |
| Disbursements | 101,183.84 | 29,390.04 |
| Subtotal: | $4,660,826.39 | $1,009,330.19 |
| Attorneys Fee Issues | | |
| Fees: Lodestar | $ 193,481.27 | $ 39,240.63 |
| Expenses: Paralegals/Clerks | 27,529.50 | 9,244.50 |
| Disbursements | 4,960.32 | 608.81 |
| Subtotal: | $ 225,971.09 | $ 49,093.94 |
| ARNOLD & PORTER | | |
| Attorneys Fee Issues | | |
| Fees: Lodestar | $ 164,893.75 | $ 25,070.76 |
| Expenses: Paralegals/Clerks | 25,770.00 | 10,061.25 |
| Disbursements | 20,916.33 | 2,589.63 |
| Subtotal: | $ 211,580.08 | $ 37,721.64 |
| TOTAL: | $5,098,377.56 | $1,096,145.77 |

*Id.* at 360–61.

10. *Id.* at 364.

11. *Id.* at 362.

12. *Id.* at 365.

13. *Id.* at 365–66.

14. *Id.* at 371 (quoting *National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1325 (D.C.Cir.1982) (per curiam)). The fee schedule proposed by Laffey and adopted by the court was as follows: $175 per hour for very experienced federal court litigators in their twentieth year or more after graduation from law school; $150 an hour for experienced federal litigators in their eleventh through nineteenth years after law school graduation; $125 an hour for experienced federal litigators in their eighth through tenth years after graduation from law school; $100 an hour for senior associates in their fourth through seventh years after graduation from law school; and $75 an hour for junior associates in their first through third years after graduation from law school. *Id.*

15. *Id.* at 360–61.

16. *Id.* at 375–76.

17. *Id.* at 376.

and Arnold & Porter attorneys in compiling the fee award. Northwest argued that only 930.25 attorney hours were compensable.[18] In objecting to the bulk of the hours sought by Laffey's attorneys, Northwest raised three objections: (1) that needless hours were spent compiling affidavits, some of which detailed the history of the case for a trial judge who had presided over it from its inception, and others of which described the billing practices of other area attorneys; (2) that needless hours were spent in interfirm meetings which would not have occurred had Bredhoff & Kaiser not retained Arnold & Porter; and (3) that needless hours were spent seeking discovery of irrelevant facts.[19]

With the variation of hours and hourly rates taken into account, Laffey proposed a lodestar for attorneys fees of $358,375.02; Northwest proposed $64,311.39.[20]

### C. *Expenses*

The parties also differed significantly on whether plaintiffs could be reimbursed for various expenses incurred in the litigation. Northwest first objected to many of the hours spent by paralegals and law clerks on the case. It then objected to compensating any out-of-pocket expenses in excess of those includable in taxable costs. Laffey sought a total of $256,650.14; Northwest offered slightly less than half of that, $127,959.23.[21]

### D. *Proposed Total Fees*

Laffey ultimately requested $5,098,377.56 in attorneys fees. This request reflected a lodestar of $1,494,450.80 on the merits, two 100 percent multipliers of that lodestar, an attorneys fee lodestar of $358,375.02, and expenses of $256,650.14.[22]

Northwest proposed a total fee of $1,096,145.77. This reflected a lodestar on the merits of $903,875.15, no multipliers, an attorneys fee lodestar of $64,311.39, and costs of $127,959.23.[23]

### E. *District Court Award*

The district court awarded plaintiffs $3,469,829.49. This award reflected a lodestar of $1,471,241.25 on the merits, a doubling of that lodestar to account for the "risk premium," an attorneys fee lodestar of $294,324.99 and costs and expenses of $216,972.00.[24]

18. *Id.* at 366–67 & n. 23.

19. *Id.* at 367–70.

20. *Id.* at 361.

21. *Id.* at 381; *see id.* at 382–88.

22. *Id.* at 360–61.

23. *Id.*

24. The actual award made by the district court is set out below.

MERITS LODESTAR

| Attorney | Hourly Rate | Merits Hours | Merits Fees | Total Merits Fees |
|---|---|---|---|---|
| Bredhoff | 175 | 0 | 0 | 0 |
| Feldman | 100 | 160.5 | 16,050.00 | $ 16,050.00 |
| Cohen | 150 | 21.5 | 3,225.00 | 6,900.00 |
|  | 175 | 21.0 | 3,675.00 |  |
| Gottesman | 150 | 3,248.375 | 487,256.25 | 876,294.36 |
|  |  |  | [sic—876,294.37] |  |
|  | 175 | 2,223.075 | 389,038.12 |  |
| Weinberg | 100 | 37.375 | 3,737.50 | 161,937.50 |
|  | 125 | 145.25 | 18,156.25 |  |
|  | 150 | 933.625 | 140,943.75 |  |
|  |  |  | [sic—140,043.75] |  |
| Petramalo | 100 | 32 | 3,200.00 | 46,121.88 |
|  | 125 | 331.375 | 41,421.88 |  |
|  | 150 | 10 | 1,500.00 |  |
| D. Clark | 75 | 1,817.75 | 136,331.25 | 199,981.25 |
|  | 100 | 636.50 | 63,650.00 |  |

MERITS LODESTAR

| Attorney | Hourly Rate | Merits Hours | Merits Fees | Total Merits Fees |
|---|---|---|---|---|
| P. Clark | 100 | 606.625 | 60,662.50 | $ 72,115.62 |
|  | 125 | 91.625 | 11,453.12 |  |
| Collins | 75 | 36.25 | 2,718.75 | 80,793.75 |
|  | 100 | 780.75 | 78,075.00 |  |
| Gilson | 100 | 53 | 5,300.00 | 5,300.00 |
| Brudney | 75 | 75.625 | 5,671.88 | 5,746.88 |
|  | 100 | .75 | 75.00 |  |
|  |  | TOTAL: | $1,471,241.25 |  |

ATTORNEYS FEE LODESTAR

| Attorney | Hourly Atty. Fee Rate | Hours | Total |
|---|---|---|---|
| Bredhoff | $175 | 10.75 | $ 1,881.25 |
| Cohen | 175 | 12.0 | 2,100.00 |
| Gottesman | 175 | 596.25 | 104,343.75 |
| Weinberg | 150 | 357.875 | 53,681.25 |
| Petramalo | 150 | 2.0 | 300.00 |
| P. Clark | 125 | 12.125 | 1,515.62 |
| Collins | 100 | 10.5 | 1,050.00 |
| Gilson | 100 | 2.625 | 262.50 |
| Brudney | 75 | 52.375 | 3,928.12 |
|  | 100 | 10.75 | 1,075.00 |
| Rezneck | 175 | 371.875 | 65,078.12 |
| Burt | 150 | 116.00 | 17,400.00 |
| Lindon | 75 | 556.125 | 41,709.38 |
|  |  | TOTAL: | $294,324.99 |

The district court carefully scrutinized the number of hours claimed by Laffey.[25] With regard to the merits, the court rejected Northwest's claim that certain issues were non-compensable as "lost," but did exclude a portion of those hours as not being reasonably expended.[26] The court also allowed compensation for hours expended by a lawyer not affiliated with either of the firms representing Laffey, but at a reduced hourly rate.[27]

The court found compensable the great majority of the 2,579 hours claimed for litigating the attorneys fee, but excluded 467.75 hours as being unreasonable or excessive.[28] The deductions made by the trial court reflected adjustments for preparation of excessive affidavits, redundant work caused by the introduction of a new law firm into the case, and other inefficient practices. It did not exclude the hours expended in offensive discovery, finding that the discovery requests, while ultimately unsuccessful, were "not frivolous, but were *bona fide* efforts to advance Plaintiffs' legitimate litigation interests." [29]

In the award the district court rejected Northwest's claim that the plaintiffs' attorneys should be restricted to their own market rates, awarding them instead "prevailing market rates" based on a matrix drawn from the rates charged by other attorneys.[30] While evidence of Bredhoff & Kaiser's normal rates was filed with the court, the trial judge apparently *relied not at all* on the firm's normal billing rates. Instead, the trial court found that it was "not limited to counsels' historic fees but must frame an award that reflects the *true value* of the services rendered." [31] The court then fixed "generous" [32] rates at the highest end of rates charged by firms in the community.

The court refused to adjust the hourly rates to account for alleged inefficiencies in the utilization of attorneys. It found the defense objection to the staffing patterns employed by Laffey's attorneys to be based on "the erroneous assumption that there is a single, correct staffing pattern for every lawsuit"; [33] it concluded that allocation of responsibility within a firm depended on many variables and found the allocation chosen by Laffey's attorneys to be reasonable.[34]

The court granted a 100 percent multiplier to account for contingency of payment.[35] In doubling the merits award to account for the contingency of payment, the court first found it beyond dispute that plaintiffs were *"entitled"* to a risk adjustment of some sort simply because receipt of fees depended on the successful termination of

COMPENSABLE COSTS & EXPENSES

| Disbursements: | | | |
|---|---|---|---|
| Merits Issues | | | $ 88,804.93 |
| Attorneys Fee Issues | | | 5,017.19 |
| | | Subtotal: | $ 93,822.12 |
| Paralegals & Law Clerks: | | | |
| Bredhoff & Kaiser | | | |
| Merits Issues | 2578.55 hrs. x $30/hr. = | | $ 77,356.50 |
| Attys. Fee Issues | 605.65 hrs. x $30/hr. = | | $ 18,169.50 |
| Arnold & Porter | 658.75 hrs. x $30/hr. = | | $ 19,762.50 |
| | | Subtotal: | $115,288.50 |
| Ms. Laffey's Expenses: | | | $ 7,861.38 |
| | | TOTAL: | $216,972.00 |

TOTAL AWARD OF ATTORNEYS FEES & COSTS

| | | | |
|---|---|---|---|
| Merits Lodestar: | | | $1,471,241.25 |
| 100% Multiplier: | | | 1,471,241.25 |
| Attorneys Fee Lodestar: | | | 294,324.99 |
| Costs & Expenses: | | | 216,972.00 |
| | | TOTAL: | $3,453,779.49 |

*Id.* at 388.

25. *Id.* at 361–71.

26. *Id.* at 362–64.

27. *Id.* at 364–65, 375 n. 37.

28. *Id.* at 366, 371.

29. *Id.* at 368–70.

30. *Id.* at 371–75; *see supra* note 14.

31. *Id.* at 373 (emphasis added and footnote omitted).

32. *Id.* at 374.

33. *Id.* at 366.

34. *Id.*

35. *Id.* at 377–80.

the litigation.[36] The court assessed the initial likelihood of success at approximately 50 percent;[37] taking into account the chance of failure and the number of hours placed at risk, the court found the plaintiffs "fully deserving" of a 100 percent contingency adjustment.[38] The court rejected a requested 100 percent multiplier for excellence of results, finding that the acknowledged excellence of the firms involved was reflected in the lodestar rates.[39]

The court found that the plaintiffs were entitled to compensation for costs which were not taxable, and held the documentation to be adequate. It also found compensable the lost income suffered by Laffey because of her involvement in the case. The trial court carefully scrutinized the costs claimed by both Laffey and her attorneys, however, and disallowed some as unreasonable.[40]

## F. *Issues on Appeal*

The defendant appeals the award to this court. This appeal presents five major issues: (1) whether the "reasonable hourly rate" for private, for-profit law firms should be based on the rates the firm charges in the marketplace; (2) whether the district court abused its discretion in finding that the plaintiffs' counsel's allocation of tasks among partners and associates was reasonable on the facts of this case; (3) whether the district court abused its discretion in doubling the lodestar fee on the merits to account for the risk of not prevailing; (4) whether the district court abused its discretion by awarding compensation for litigating the attorneys fee issue; and (5) whether plaintiffs in Title VII and Equal Pay Act cases may be awarded compensation for reasonable expenses which are not taxable costs under 28 U.S.C. § 1920 (1982).

## II. ANALYSIS

■ Fair Labor Standards Act of 1938 [41] and Title VII of the Civil Rights Act of 1964 [42] authorize district courts to award a reasonable attorneys fee to prevailing civil rights litigants. The purpose of such provisions is to encourage private litigants to act as "private attorneys general" on behalf of enforcement of the civil rights laws.[43] Congress clearly hoped to provide an adequate economic incentive for private attorneys to take employment discrimination cases, and thereby to ensure that plaintiffs would be able to obtain competent legal representation for the prosecution of legitimate claims.[44]

Despite the clarity of Congress's objective, "[this] new field of law ... has grown so fast and become so complex that it has baffled the efforts of courts and lawyers to comprehend and apply it." [45] Before 1975, federal courts had awarded attorneys fees on their own authority on the theory that private attorneys general should be compensated for enforcing certain important rights.[46] In *Alyeska Pipeline Service Co. v. Wilderness Society*, however, the Supreme Court criticized this practice and warned lower federal courts that they lacked power to award fees to private at-

**36.** *Id.* at 378. The district court recognized that any adjustment for contingency depends upon the contingency of payment, and only derivatively upon the contingency of success. *Id.* at 377. The court apparently erroneously assumed, however, that contingency adjustments were always to be made when payment was uncertain. *Id.* at 378.

**37.** *Id.* at 379.

**38.** *Id.* at 380.

**39.** *Id.* at 376–77.

**40.** *Id.* at 381–88.

**41.** 29 U.S.C. § 216(b) (1982).

**42.** 42 U.S.C. § 2000e–5(k) (1982).

**43.** *Newman v. Piggie Park Enters.*, 390 U.S. 400, 401–02, 88 S.Ct. 964, 965–66, 19 L.Ed.2d 1263 (1968).

**44.** *Id.*

**45.** Cutler, *Foreword* to 1 M. DERFNER & A. WOLF, COURT AWARDED ATTORNEY FEES vii (1983).

**46.** *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 271 n. 46, 95 S.Ct. 1612, 1628 n. 46, 44 L.Ed.2d 141 (1975) (citing cases).

torneys general in the absence of express authorization from Congress.[47] Congress enacted a law authorizing such awards to prevailing civil rights litigants the following year.[48]

Throughout this turbulent period, confusion reigned. One scholar's review of the case law led him to conclude that "[t]he only truly consistent thread that runs throughout federal court decisions on attorneys' fees is their almost complete inconsistency."[49] He elaborated:

Given the frequency with which courts are confronted with the task of fee setting and the impact that it has upon the allocation of legal resources, one would expect a general consensus to have emerged on the manner in which reasonable attorneys' fees should be determined. On the contrary, there are nearly as many approaches to the issue as there are judges.... [M]any lower courts have confronted the problem with little or no analysis; those courts that have been more analytical have adopted widely varying approaches. To a great extent the outcome to these cases has depended upon "the roll of the dice"—from court to court and from case to case.[50]

Examples of inconsistent fee awards to prevailing parties are not hard to find. Suggestive of the lack of clear guidelines is a report on the "U.S. Court of Appeals for the Second Circuit, ... [which] recently upheld Section 1988 awards to Wall Street's Cravath, Swain & Moore at the hourly rate of $60 in *McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1983), and to the New York Legal Aid Society at rates exceeding $150 per hour in the *Blum [v. Stenson, —— U.S. ——,* 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ] case."[51] More generally, a National Association of Attorneys General study released just this year found that:

With different approaches being applied by the different circuits and even by various courts within each circuit, parties ... are subject to different approaches and hence different results. Courts disagree on what factors should be applied, how they should be applied, and even what they mean... As a result, in cases decided between 1974 and 1979, hourly rates awarded to civil rights attorneys varied by 685 percent.[52]

"At present, the enormous variation of fee awards cannot be explained in terms of the differing facts and circumstances from case to case.... As a result, from court to court and from case to case, attorneys and litigants who are similarly situated are subjected to widely differing treatment."[53]

To reduce the arbitrariness characteristic of court awards of attorneys fees, the Supreme Court recently intervened and approved a version of the lodestar method of setting rates. In *Hensley v. Eckerhart,*[54] the Court set forth the elements of this method for arriving at a fair attorneys fee: "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable

**47.** *See id.* at 263–64, 269, 95 S.Ct. at 1624–25, 1627.

**48.** Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94–559, 90 Stat. 2641 (codified at 42 U.S.C. § 1988 (1982); *see* S.Rep. No. 1011, 94th Cong., 2d Sess. 1, *reprinted in* 1976 U.S. Code Cong. & Ad.News 5908, 5909; H.R.Rep. No. 1558, 94th Cong., 2d Sess. 2–3 (1976).

**49.** Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?,* 126 U.Pa.L.Rev. 281, 292 (1977).

**50.** *Id.* at 283–84, 95 S.Ct. at 1634–35.

**51.** Diamond, *The Firestorm over Attorney Fee Awards,* 69 A.B.A.J. 1420, 1420 (1983).

**52.** Report to the Congress of the National Association of Attorneys General, *Civil Rights Attorney's Fees Awards Act of 1976* 12 (3 Feb. 1984), *quoted in* Address by Randall Rader, Second Institute on Federal Civil Procedure (Houston, Tex. May 1984) (unpublished manuscript entitled *The Fee Awards Act of 1976: Examining the Foundation for Legislative Reform of Attorney Fee Shifting* 24).

**53.** Berger, *supra* note 49, at 292.

**54.** 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), *Hensley* involved the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1982). The inquiry is the same. *See infra* note 66.

hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." [55] The product of the reasonable hourly rate times the hours reasonably expended is termed the "lodestar" figure.[56]

In *Hensley* the Court specified the basic methodology for setting the "hours reasonably expended." [57] The district court must exclude hours not reasonably worked. The parties are first called upon to exclude hours which are "excessive, redundant, or otherwise unnecessary"; should they fail to exercise such " 'billing judgment,' " the court should exclude the hours.[58] Also eliminated from the calculus are hours spent on "unsuccessful claims." [59]

More recently the Court has provided guidance on how to derive the second half of the equation, the "reasonable hourly rate." In *Blum v. Stenson*,[60] the Court faced a situation in which a non-profit law firm had represented the prevailing plaintiffs. The court held that the attorneys should receive fees based on the "prevailing market rates in the relevant community," rather than on the cost of providing the legal service.[61]

█ As the Court noted in *Hensley*, setting the lodestar figure "does not end the inquiry." [62] The district court may adjust the fee upward or downward due to factors not reflected in the lodestar, with the most important factor supporting adjustment being the degree of success obtained. In *Hensley* the Supreme Court observed that the trial judge "may consider other factors" identified in *Johnson v. Georgia Highway Express, Inc.*, though noting that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." [63] Among the factors identified in *Johnson* is "[w]hether the fee is fixed or contingent." [64]

In adopting the lodestar method of setting attorneys fees, the Supreme Court has placed great emphasis on the need for an efficient, objective system of awarding fees. One stated reason for choosing the lodestar approach is that it "provides an objective basis" on which to base the more subjective "enhancements" of the fee.[65] The Court clearly hoped that this objective basis would enable parties and courts to avoid "a second major litigation" over the size of attorneys fees; ideally, the Court posited, the parties could settle the attorneys fee issue out of court.[66]

### A. *Reasonable Hourly Rates*

All parties agree that the attorneys for the plaintiffs in this case ought to be paid a

---

**55.** 103 S.Ct. at 1939.

**56.** The "lodestar" approach was first adopted by the Court of Appeals for the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp. (Lindy I)*, 487 F.2d 161, 166–69 (3d Cir.1973), and its successor case, *Lindy Bros. Builders Inc. v. American Radiator & Standard Sanitary Corp. (Lindy II)*, 540 F.2d 102, 108–22 (3d Cir.1976). This circuit adopted the lodestar methodology in *Copeland v. Marshall*, 641 F.2d 880, 890–91 (D.C.Cir.1980) (en banc).

**57.** 103 S.Ct. at 1939.

**58.** *Id.* at 1940 (quoting *Copeland v. Marshall*, 641 F.2d at 891).

**59.** *Id.*

**60.** —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

**61.** *Id.* at 1547.

**62.** 103 S.Ct. at 1940.

**63.** *Id.* at 1940 n. 9 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

**64.** 488 F.2d at 718.

**65.** 103 S.Ct. at 1939.

**66.** *Id.* at 1941. The Court intended to promote objectivity and efficiency in fee setting under the provisions governing this case, 29 U.S.C. § 216(b) (1982) and 42 *id.* § 2000e–5(k), as well as under 42 *id.* § 1988, which was before the Court in *Hensley* and *Blum*. The Court in *Hensley* observed that § 2000e–5(k) and § 1988 were in pari materia and emphasized that "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.' " 103 S.Ct. at 1939 n. 7.

"reasonable hourly rate"; [67] all agree that the ultimate measure of the reasonableness of the hourly rate should be the "market rate" for Bredhoff & Kaiser's services.[68] The rather narrow task before this court is to determine how that "reasonable market rate" should be set.

Laffey argues that the court must apply the same procedures to "for-profit" firms that it applies to nonprofit legal organizations.[69] In each case the court must assess

67. See Copeland v. Marshall, 641 F.2d 880, 892 (D.C.Cir.1980) (en banc).

68. See Blum v. Stenson, —— U.S. ——, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

69. Brief for Appellees at 28–43. Laffey's attorneys also argue that the rates charged by Bredhoff & Kaiser do not reflect the firm's market value. It is claimed that the Bredhoff & Kaiser attorneys could increase their rates at will, but choose to subsidize their clients by charging lower rates. Bredhoff & Kaiser is thus presented as a "quasi" public interest law firm—following the same billing practices as an ordinary private law firm, employing the same firm structure as a private law firm, but differing in that its lower rates reflect the value its lawyers put on serving "good" clients. The Bredhoff & Kaiser attorneys have chosen "to represent Bredhoff & Kaiser's existing clientele—despite the lower hourly rates—because of the personal satisfactions they derive from that practice." Id. at 29 n. 16 (citation omitted).

We do not doubt the sincerity of this assertion, nor do we doubt that the Bredhoff & Kaiser attorneys could have pursued careers at other firms. We find, however, that this court and all courts are incapable of adjusting rates of private law firms to reflect the lost income due to "personal satisfactions." There simply is no means of distinguishing those warranting an adjustment from those that do not.

First, the fact that Bredhoff & Kaiser's clients cannot afford unlimited legal fees fails to distinguish them. Small corporations, individual clients, and unions alike have finite resources; even those with deep pockets are driven to spend their money in the most efficient way. There simply is no pool of clients eager to spend legal fees without regard to value or cost.

Nor does it matter that many of Bredhoff & Kaiser's clients enjoy a privileged tax status that makes unavailable any deduction for legal fees. Again, many sorts of clients are unable to claim tax deductions for attorneys fees—including nonprofit foundations, corporations without taxable profits, and individuals whose legal expenses are not business related.

Finally, a fee setting formula that requires district courts to adjust the award if the prevailing lawyers serve "good" clients is unacceptable. At worst, this factor invites courts to reward those plaintiffs who represent causes the judge involved finds estimable, a discretionary power we doubt Congress intended to confer on the judiciary. At best, it allows attorneys to indulge in self-serving claims that their clients—whether they be unions representing allegedly downtrodden workers, corporations which claim to create wealth and jobs, or individuals who need good legal advice—are the "best" and most deserving. Courts should allow personal satisfactions to remain personal.

The dissent relies on three of this court's cases to prove that we ordinarily set the reasonable hourly rate above the firm's customary billing rate to make up for a firm's charging below-market rates to clients who serve the public interest. See dissent at 33–35 & n. 8. The dissent's characterization of the holdings of these cases is too broad.

The first case, Sierra Club v. Gorsuch, 684 F.2d 972 (D.C.Cir.1982) (per curiam), rev'd on other grounds sub nom. Ruckelshaus v. Sierra Club, 462 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983), is simply inapposite. In Gorsuch, we stated that an affidavit of a private attorney retained by a non-profit public interest group was not necessary to complete the fee application in that particular case, because "evidence of recent court awarded fees in comparable cases to comparably experienced lawyers exist[ed] to satisfy the demands of Copeland and NACV that court awarded fees be based on the prevailing market rate for the attorney's services." Id. at 975 (footnote omitted). Gorsuch is consistent with our approach that when calculating fee awards to attorneys or law firms without firmly established billing practices, the prevailing community rate for the services of lawyers of similar skill, experience, and reputation must be consulted. See id. (implying that attorney did not have established billing practice by noting that he "represent[ed] primarily non-profit public interest organizational clients" and in the same sentence directing the reader to a quotation in a footnote discussing "lawyers associated with public interest groups" as those "not hav[ing] an established 'billing rate' that reflects how their own services have been valued in the market" (quoting National Ass'n of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1325 (D.C.Cir.1982) (per curiam))). It does not support the notion that lawyers should be paid more for serving "good" clients.

The second case, National Treasury Employees Union v. Nixon, 521 F.2d 317 (D.C.Cir.1975), did authorize enhancement of a fee award to take account of the possibility that "counsel serve organizations like appellant for compensation below that obtainable in the market because they believe the organizations further the public interest." Id. at 322–23 (internal brackets and footnote omitted). But the court's authority for awarding a fee in National Treasury Employees

the "true value" of attorneys with similar skills, and pay them according to that true value. The rates charged by a firm have some probative value, but may be discounted or ignored if the court finds that other attorneys of similar caliber charge more or less. The trial court enjoys broad discretion to set rates within the parameters of the rates charged by other lawyers in the community.

Northwest argues that the complex and burdensome task of establishing a "prevailing market rate" is a necessary evil which cannot be avoided where non-profit firms are involved, but which should be dispensed with where private, for-profit law firms have established market rates for similar services.[70] Under this approach the rates customarily charged by a firm would presumptively stand as the reasonable rates.

The positions of the parties are no doubt affected by the fact that in this case the "prevailing market rate" established by the district court exceeds "any hourly rate at which [Bredhoff & Kaiser] ... has ever billed its regular fee-paying clients."[71] However, this discrepancy need not exist in every case—under both approaches the touchstone remains the "market value" of the services rendered; any deviation between the court's and the market's assessment suggests that one or the other has misvalued the attorneys' services. The choice between the two methods thus does not involve a categorical choice between higher rates or lower rates, but questions of judicial administration.

1. Congressional Intent

■ As the Supreme Court observed in *Blum,* "[r]esolution of these ... argu-

---

*Union* was the "common fund" theory, *see id.* at 319, under which equitable principles designed to prevent unjust enrichment, *see Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980); Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds,* 87 HARV.L.REV. 1597, 1625–26, 1652 (1974), may provide sufficient discretion to award fees commensurate with an attorney's "true value," *cf. Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 166–67, 59 S.Ct. 777, 779–80, 83 L.Ed. 1184 (1939) (emphasizing that common fund fee awards originated in the authority of the chancellor "to do equity in a particular situation" and the concomitant necessity to make individualized applications of this "discretionary power"); *Trustees v. Greenough,* 105 U.S. (15 Otto) 527, 536, 26 L.Ed. 1157 (1881) (Chancery's control over fees in common fund litigation is "to be exercised as equity and justice may require"); *Gee v. Pritchard,* 36 ENG.REP. 670, 679 n. 1 (Ch. 1818) (Equity is as inconstant as the length as the Chancellor's foot (quoting Selden's *Table Talk* )). Although the propriety of this enhancement for serving "public interest" clients may be questioned, we need not reopen that matter here. For in this case we construe a statute, the purpose of which is to induce lawyers to undertake representation of meritorious civil rights claimants. Fee awards greater than the opportunity cost of the lawyers' foregone litigation opportunities would constitute congressionally-proscribed "windfalls" under the act. *See infra* pp. 15–16.
Finally, the dissent's citation of *National Association of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1326 (D.C.Cir.1982) (per curiam)—far from proving that fee awards are

adjusted *upward* to compensate lawyers for not charging their clients what the market will bear—supports our holding that an attorney's customary billing rate is presumptively his reasonable hourly rate for determining an award of attorneys fees: "This ['prevailing community'] rate is not what he [the attorney] would have liked to receive, or what the client paid in a single fortunate case, but what on average counsel has *in fact* received. It is obvious that where counsel customarily exercises billing judgment by not billing at the market rate or for the full amount of time expended this fact must be considered in calculating counsel's *true billing rate.*" *Id.* (emphasis added and footnote omitted). As we stated in the paragraph preceding the one cited by the dissent, "counsel for applicants may be required to submit specific evidence of his or her actual billing practice during the relevant time period, if in fact applicant has a billing practice to report.... [T]he actual rate that applicant's counsel can command in the market is itself highly relevant proof of the prevailing community rate." *Id.* (footnote omitted). Although "affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases" and "[r]ecent fees awarded by the courts" provide "useful guides in setting an appropriate rate," "[t]he best evidence would be the hourly rate customarily charged by the affiant himself or by his law firm." *Id.* at 1325.

70. Brief for Northwest Airlines, Inc. at 28–46.

71. 572 F.Supp. 354, 372 (D.D.C.1983).

ments begins and ends with an interpretation of the attorney's fee statute." [72] "The legislative history," the Court pointed out, "explains that 'a reasonable attorney's fee' is one that is 'adequate to attract competent counsel, but ... [that does] not produce windfalls to attorneys.' " [73] The "windfall" Congress sought to avoid is the awarding of fees in excess of the rate at which qualified counsel would be willing to represent civil rights claimants who have legitimate grievances. The congressionally-mandated inquiry is thus *not* into the "true value" or worth of an attorney's services. Instead, the trial court must ascertain the fee at which competent counsel would be willing to accept meritorious civil rights cases. [74] As this court recently stated in *Murray v. Weinberger*, "the purpose of the statute [authorizing fee shifting in Title VII cases] is to benefit meritorious claimants—not to subsidize the legal profession." [75]

Although the Supreme Court has not set out the method by which district courts are to determine the hourly rates of attorneys working for profit, the Court in *Blum* took pains to note that the "prevailing market rate"—that is, the rate "prevailing in the

community for similar services by lawyers of reasonably comparable skill, experience and reputation"—was a term of convenience, rather than some ideal rate which all firms should or could charge. [76] The Court recognized that setting a market rate for legal services is inherently difficult, since in that "traditional sense there is no such thing as a prevailing market rate for the service of lawyers in a particular community." [77] But the Court observed that although the fee setting process in section 1988 cases differed from most private sector cases in that the *losing* party paid his opponent's legal fees, [78] the "critical inquiry in determining reasonableness is now generally recognized as the appropriate hourly rate. *And the rates charged in private representations may afford relevant comparisons.*" [79] Because the Legal Aid Society lawyers in *Blum* had no established billing rates, the Court required the parties to submit evidence of the "prevailing community rate." [80] Rates consistent with "those prevailing in the community" were deemed to be reasonable and were referred to—"for convenience"—as the "prevailing market rate." [81]

72. *Blum v. Stenson*, — U.S. —, 104 S.Ct. 1541, 1546, 79 L.Ed.2d 891 (1984).

73. *Id.* at 1548 (quoting S.Rep. No. 1011, 94th Cong., 2d Sess. 6 ("It is intended that the amount of fees awarded under ... [§ 1988] be governed by the same standards which prevail in other types of equally complex Federal litigation ... [Application of the] appropriate standards ... have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys."), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913); *see also* H.R.Rep. No. 1558, 94th Cong., 2d Sess. 9 (1976) ("The application of these standards will insure that reasonable fees are awarded to attract competent counsel in cases involving civil and constitutional rights, while avoiding windfalls to attorneys.").

74. The dissent assumes its own conclusion by stating that the "prevailing market rate" approach inquires into the fees of equally skilled attorneys litigating equally complex matters. This is the proper inquiry when awarding fees to attorneys without billing histories; for lawyers in ·nonprofit law firms, for example, a proxy for the market must be found in order to set a reasonably hourly rate. When market

information is available, however, a much more precise measure is at hand and its use is consistent with Congress's goal of awarding attorneys fees at a level sufficient to induce competent counsel to represent bona fide civil rights claimants.

75. 741 F.2d 1423, at 1427 (D.C.Cir.1984).

76. — U.S. —, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984).

77. *Id.*

78. *See id.*

79. *Id.*

80. *See id.*

81. *Id.*
   With regard to awards to private law firms, the Court may well have intended the prevailing community rate to function as an external standard by which district judges could verify the reasonableness of an attorney's customary billing rate.
   In seeking some basis for a standard, courts properly have required prevailing attorneys to

This court's cases are consistent with the Supreme Court's recent pronouncement in *Blum*. In *Copeland v. Marshall*,[82] this court approved fees based on the hourly rates customarily charged by the lawyers in a firm.[83] Again, in *National Association of Concerned Veterans v. Secretary of Defense*,[84] we stated that "[t]he best evidence would be the hourly rate customarily charged by the affiant himself or by his law firm."[85] And in *Concerned Veterans*, while the applicants attempted to support their claim by referring to evidence of fees received in similar cases, the government argued that "there was no evidence ... supporting the billing rates assigned to the associates who worked on this case"; this court remanded, holding that "[a]s private counsel with fee-paying clients, the applicants should have provided the Court with more informative data about the value of their services in the market."[86] Most recently, in *Murray v. Weinberger*, this court approved the district court's use of attorneys' customary billing rates in awarding fees for litigation brought under Title VII.[87] Other circuits have also determined the reasonableness of attorneys fees by reference to the firm's own established rates.[88]

The district court apparently believed that setting the "market rate" required precisely the same methodology employed to set the "prevailing market rate"[89] in *Jordan v. United States Department of Justice*,[90] in which this court accepted an affidavit recounting the rate "prevailing in

---

justify the reasonableness of the requested rate or rates. To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to—for convenience—as the prevailing market rate.
*Id.*

**82.** 641 F.2d 880 (D.C.Cir.1980) (en banc).

**83.** *See id.* at 887–88, 902.

**84.** 675 F.2d 1319 (D.C.Cir.1982) (per curiam).

**85.** *Id.* at 1325.

**86.** *Id.* at 1336. This holding in *Concerned Veterans* clearly requires that the rates actually be presumptively based on the firm's current rates, even as to the particular lawyers involved. It makes no sense to require a firm to document its own billing history and then totally ignore that history in setting the hourly rate. Nonetheless, that is what the district court did here.

**87.** 741 F.2d 1423, at 1428 & n. 21 (D.C.Cir.1984).

**88.** *See, e.g., Pawlak v. Greenawalt*, 713 F.2d 972, 979 (3d Cir.1983) ("[T]he value of an attorney's services is generally measured by his billing rate." (citation omitted)), *cert. denied,* —— U.S. ——, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984); *Louisville Black Police Officers Org., Inc. v. City of Louisville*, 700 F.2d 268, 277 (6th Cir.1983) ("As we pointed out in *Northcross* [*v. Board of Education of the Memphis City Schools* ] the marketplace normally sets a value for a private attorney's services: 'The hourly rate charged by an attorney for his or her services will normally reflect the training, background, experience and skill of the individual attorney.' 611 F.2d [624] at 638 [6th Cir.1979] "); *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 769 (7th Cir.1982) ("If, however, a party does not find counsel readily available in that locality with whatever degree of skill may reasonably be required, it is reasonable that the party go elsewhere to find an attorney, and the court should make the allowance on the basis of the chosen attorney's billing rate unless the rate customarily charged in that attorney's locality for truly similar services is deemed to require an adjustment."), *cert. denied*, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Taylor v. Philips Indus.*, 593 F.2d 783, 787 (7th Cir.1979) (affirming district court's choice of hourly rate that coincided with attorney's longstanding billing rate); *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir.1973) ("The value of an attorney's time generally is reflected in his normal billing rate."). *See generally* E. Larson, Federal Court Awards of Attorney's Fees 198 (1981) ("The means by which the hourly rates are determined is also fairly well established. The starting point ordinarily is the normal billing rate of each attorney as reflected by affidavits submitted to the court." (citation omitted)). Indeed, this apparently is what the district court did in *Copeland*. *See Copeland v. Marshall*, 641 F.2d 880, 887–88, 902 (D.C.Cir. 1980) (en banc).

**89.** *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 373–74 (D.D.C.1983).

**90.** 691 F.2d 514 (D.C.Cir.1982).

the local legal community" [91] for similar legal services. But this court in *Jordan* —like the Supreme Court in *Blum* [92] —did not discuss the manner in which reasonable hourly rates for *private* attorneys should be set; because the attorneys involved had no regular billing rates, the court was required to set a hypothetical rate where none otherwise existed.

The approach intimated by the Supreme Court and routinely employed by this and other circuit courts best effectuates Congress's objective of attracting qualified counsel to bona fide civil rights cases. By setting the fee award at the attorney's customary billing rate, the opportunity cost of foregone representations is precisely offset by a fee award in the same amount. As one academician has explained:

> The court must determine a value for the attorney's time that will place statutory fee cases on a competitive economic basis and that will compensate attorneys in equitable fee cases for the loss sustained in creating the appropriated benefit. *For lawyers engaged in customary private practice, who at least in part charge their clients on an hourly basis regardless of the outcome, the marketplace has set that value. For these attorneys, the best evidence of the value of their time is the hourly rate which they most commonly charge their fee-paying clients for similar legal services.* This rate reflects the training, background, experience, and previously demonstrated skill of the individual attorney in relation to other lawyers in that community.

... [A] somewhat different situation is presented when the attorney does not have a customary hourly rate set by the competitive marketplace. [93]

### 2. Administrability, Equity, and Efficiency

Several strong policy reasons support tying the "reasonable hourly rate" to the firm's own billing rates. [94] Proceeding presumptively with the firm's own rates allows the court to avoid the essentially impossible task of selecting one rate over another from a wide range of "market" rates, it limits the power of the trial judge arbitrarily to reward or punish attorneys by setting rates virtually at will, and it allows the parties and the court to avoid a "second major litigation" over the ratemaking process. The marketplace best measures "market value"; appraisal by no other method has as much claim to veracity and objectivity.

### a. The difficulty of judicial ratemaking

No satisfactory method has been devised for "reinventing" the market for attorneys' services. Setting the market value of any good or service can be a treacherous business. The volatility of the stock and commodities markets speaks eloquently of the difficulty of setting prices even for fungible goods in an efficient market; the complexity of the ratemaking procedures administered by federal regulatory agencies suggests the difficulty of constructing appropriate economic models from which to derive fair rates.

**91.** *Id.* at 521 (footnote omitted).

**92.** *See Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 1545, 79 L.Ed.2d 891 (1984) (issue whether New York Legal Aid Society's award of attorneys fees should be calculated on a "cost-plus" basis or on the basis of "prevailing market rates").

**93.** Berger, *supra* note 49, at 321 (emphasis added).

**94.** Laffey finds anomalous the possibility that two different law firms with lawyers of similar credentials might receive different hourly rates for work on the same case. To the extent that such an anomaly exists, it mirrors the anomalous situation that would exist if the same firms were hired by a fee paying client. Moreover, that paying lawyers of the same "true value" charge different rates is no more anomalous than the fact that paying lawyers of dissimilar credentials and "true value" charge the same rate. Inequities of one sort or the other are bound to creep in so long as judges do not perfectly assess the value of various attorneys' services; such inequities can be best minimized by tying the firm's compensation to the compensation set by the market.

The ratemaking process must necessarily prove even more difficult where attorneys are involved. As the Supreme Court has recognized, because attorneys are not fungible no one rate would be appropriate for all.[95] Nor can the appropriate rate be set by reference to easily established factors, such as academic credentials.[96] Some factors which make one attorney worth more than another—such as academic credentials and years of experience—are either reducible to paper or apparent to a trial judge. But others—such as the ability to communicate with clients, efficiency, judgment, and personality—are not so easily reduced or quantified. Given the complexity of the market for legal services, setting the "true value" for an individual attorney's services promises to be neither a science nor an art, but a largely arbitrary divination.

Nor do references to the overall market provide an infallible guide to the value of a particular commodity. An investor in International Business Machines would not be content to track the price of his stock by reference only to the overall average of the New York Stock Exchange; he would want the quotation for his particular stock. Similarly, he would not likely wish to sell his stock for a price picked from among the prices of all stocks on the exchange; he would prefer to sell at the price for which his stock sold.

If there were a set market price[97] or if the rates clustered in a narrow range, reference to other attorneys would provide an adequate guide. But, as this case indicates and as the dissent acknowledges, the spread in "market rates" charged by firms offering similar services is a broad one.[98] In a case such as this one, which involves thousands of hours, a choice from either extreme of the spectrum would affect the ultimate fee award by hundreds of thousands of dollars.

### b. Arbitrariness

If no basis exists for the figures used by the district court to set the lodestar, the entire elaborate process becomes a charade. The process merely mimics—rather than provides—mathematical objectivity. When the numbers fed into the lodestar are fundamentally arbitrary, no amount of calculation can restore objectivity. The fee setting approach becomes a complex and expensive overlay of delusive mathematical

---

**95.** *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984).

**96.** The District Court made no effort to draw any correlation between the academic credentials of the Bredhoff & Kaiser attorneys—which it used to justify awarding them higher rates than their co-counsel, Gilbert Feldman—and their "true value" in the market. Such correlations may not be as easy to draw as the district court opinion assumes; indeed, comparison of Martindale-Hubbell listings with billing data provided by the appellees suggests that many highly paid attorneys are lacking just the sort of resume credentials that the district court relied on so heavily. *See* R. 221A, Exh. 1; Brief for Appellees, app. 1. Many of the attorneys charging high rates lacked law review or clerkship experience of the type claimed by the Bredhoff & Kaiser attorneys; others did not graduate from the "top ten" law schools like those Laffey's lawyers attended. *See id.* The data for one firm indicated that one partner with glittering credentials and stiff billing rates nonetheless billed at slightly lower rates than a slightly younger partner lacking equivalent academic credentials. *See id.* While such data should

not be taken to disparage the market value of academic credentials, it does suggest that academic credentials alone may not provide a reliable guide to an attorney's worth.

**97.** At the time the "prevailing rate" terminology began to be used, it was still common for local bar associations to issue suggested or minimum fee schedules. Such schedules are now a thing of the past. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

**98.** Despite the significant number of civil rights cases tried in this circuit and the existence of a discrete legal community, the district court has been unable to construct the sort of fee "matrix" requested by the United States. The Supreme Court in *Blum* implicitly explained why such an effort must be unsuccessful—there really is no such thing as a prevailing community rate. Creation of such a rate by fiat is a task for the Congress, and not for this court. *See* 104 S.Ct. at 1547 n. 11. All we can do is simplify and make more certain—and thus make more speedy, economical, and ultimately fairer, *see supra* pp. 28–36—the fee setting process.

form over a process fundamentally grounded in an arbitrary assessment.[99]

So long as the result is arbitrary, it would be cheaper, simpler and easier to return to the days when the judge simply awarded an undivided figure that seemed fair. An examination of the district court's opinion in this case underscores how arbitrary the picking of a fee could be. The record reflected a broad range of rates for attorneys of similar experience.[100] In picking within this broad range, the district judge offered no explanation other than that he felt the Bredhoff & Kaiser lawyers to be worth it. There was no analysis of the market for legal services; there was no explanation as to why the Bredhoff & Kaiser attorneys were worth more in this case than they were in similar cases litigated at the same time.

The dissent does not defend the district court's judgment on this score. Rather than fleshing out its "true value" test for the benefit of trial courts in the future, the dissent is content to score debater's points by "nickel and diming" the guidelines we offer. In accordance with its limited ambition, the dissent does not refute the relative superiority of customary billing rates to determine the "reasonable hourly rate." The dissent concedes, in fact, that "in some, but by no means all, instances the applicant's customary billing practice will provide the 'best evidence' of the market rate."[101]

The dissent could have profitably stopped there, for the criticisms it offers of historical billing rates apply with even greater force to the components of the "true value" test it has chosen to defend. For example, the dissent quite correctly remarks that private sector billing rates often "depend on the nature of the service rendered, the relationship with the client, its ability to pay, or myriad other considerations."[102] But the trial court should be able to choose the billing rate for the most closely analogous service, which logically would be found among the rates charged by the claimant firm, and the range of billing rates for different clients should not be too wide (especially if the court—as it should—disregards abnormally high or low rates which may reflect the particularly attractive or distasteful nature of a matter, extraordinary time pressures, and other extraneous considerations). Whether the dissent accepts these reassurances or not, the district court's task is certainly easier when it has only one firm's rate structure to grapple with rather than that of an entire legal community. If the customary billing rates of an individual lawyer or law firm cannot provide "predictability and ease of administration,"[103] the dissent's recommended open-ended inquiry into the going rate for legal services over an entire community must, a fortiori, lead to whimsical and capricious awards.[104]

---

**99.** The data processing profession has captured this problem with a phrase: "Garbage in, garbage out."

**100.** According to the dissent, the range established by prevailing community rates is virtually indeterminate. *See* dissent at 31 n. 1 ("As this case demonstrates, attorneys in a given community charge a wide range of rates.... Thus in all but the rarest cases 'bracketing' the fee applicant's billing rate is an empty gesture ...."). If this were true, the dissent's formula would leave district judges at sea in their attempts to award attorneys fees in a consistent fashion. Because the dissent's approach provides little guidance for choosing the "comparable" fee within this assertedly broad range, arbitrary and inconsistent fee awards are rendered virtually inevitable. In fact, of course, the district judge should disregard abnormally high and low billing rates in determining a reason-

able hourly rate, just as the score-keeper at an Olympic gymnastic event throws out the high and low scores to arrive at a consensus rating.

**101.** *Id.* at 37 (citation omitted).

**102.** *Id.* at 36.

**103.** *Id.* at 12.

**104.** The dissent also notes that billing rates change over time. *See id.* at 13. To deal with these fluctuations, the district court should simply match the billing rate governing a particular period to the hours reasonably expended during that period. The district court need not perform this calculation if it is "[u]sing current market rates to ... counterbalance the delay in payment" of legal fees by the losing party. *Murray v. Weinberger*, 741 F.2d 1423, at 1433 (D.C. Cir.1984).

### c. Avoiding a "second major litigation"

The approach taken by the district court also conflicts with the Supreme Court's admonition to avoid engendering a "second major litigation" over the scope of attorneys fees.[105] If the court takes seriously its self-imposed mandate to fix the "true value" of attorney services, it must draw on the range of techniques used by other ratemaking agencies—voluminous records, expert testimony, elaborate economic models, and so forth. This elaborate procedure, of course, will be just the sort of protracted proceeding this court and the Supreme Court have inveighed against.

Protracted proceedings cannot be avoided by vesting broad, unreviewable discretion in the trial judge to fix rates. Vesting absolute discretion in the district court to value an attorney's services not only permits arbitrary fee awards, but also necessarily hampers accurate forecasting of what rate ultimately will prove "reasonable." So long as so much flex remains in the hourly rate, the parties—especially those whose every hour will be compensated by the other side—have little reason to settle the amount of the fee award; sheer economic self-interest mandates litigating the "reasonable hourly rate" to the bitter end. *The uncertainty would diminish, and the chance of settlement increase, if the hourly rates were set according to the established rates of those seeking compensation.*

It is easy to see that the incentives to settle are much stronger when fees are based on the prevailing firm's historical rates. The combination of documented billable hours and a predictable hourly rate yields a projected lodestar figure that the

parties can expect will withstand scrutiny. With specific enhancements limited to the exceptional case, the size of the fee award can be predicted.

*The losing party has every incentive to pay a predictable fee*—any reluctance to pay only generates litigation over the size of the fee award, without much change of decreasing the final award. Indeed, the losing party pays a double penalty for litigating the size of the attorneys fees, since it must pay both its own and the prevailing party's attorneys for litigating the fee award. With the magnitude of the fee award more or less apparent from the start, it is in the interest of the losing party to settle promptly and fully.

So long as the losing party behaves rationally, the winning party has little incentive to press for excessive fees. The prevailing party will not be likely to collect higher fees for the merits, and if unreasonable in pressing its claims will not be compensated for the time spent litigating attorneys fees. The prevailing party would thus be well advised to litigate only when the losing party is being unreasonable—collecting both what is due on the merits and additional fees for the attorneys fee litigation—but settle when a reasonable settlement is offered.

Such settlements depend on the *predictability* of the size of the ultimate award. Such a fee can be predictable only when the components—the hourly rate, the hours worked, and the specified enhancements—are also predictable. By basing the hourly rate on a predictable figure, today's opinion takes a significant step toward a system where fee awards routinely will be settled.[106]

---

**105.** *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *see National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1324 (D.C.Cir.1982) (per curiam); *Copeland v. Marshall,* 641 F.2d 880, 896 (D.C.Cir.1980) (en banc).

**106.** Notwithstanding the benefits of greater predictability, the dissent asserts that use of historical billing rates will give defendants less incentive to settle, because they "will benefit from the happenstance that plaintiff's counsel historically

charged lower fees than those prevailing in the community." Dissent at 34. This comment ignores the fact that their opponents' attorneys fees—for which they will ultimately be liable if plaintiffs' claims are adjudged valid—will increase in direct proportion to their improper refusal to settle. Moreover, if a plaintiff's lawyer charged fees higher than the going rate, as might well be the case for many private law firms litigating pro bono publico, the purported disincentive to settle would be reversed.

By providing a meaningful benchmark for use by trial courts, we also hope to minimize appellate intervention into disputes over fee awards. The dissent argues, rather counterintuitively, that by providing guidelines to district judges we will encourage litigants to challenge the fee setting methodology on appeal in this court.[107] We encourage no such conduct. First, by acknowledging our routine use of an attorney's customary billing rates to determine the reasonable hourly rate, we reaffirm past practice. Our adherence to precedent will not raise false hopes of successful appeals.

In contrast, it is the approach employed by the district court and defended by the dissent that gives rise to frequent appeals. Because no litigant can be sure that the fee award represents the prevailing attorney's "true value," he will have an almost irresistable incentive to seek an opportunity to convince this court that the district judge abused his discretion. Indeed, in many instances he will have good cause for his ire: the inevitable variability and inconsistency of the "true value" approach creates an ever growing pool of litigants with genuine grievances. Rather than review an essentially unguided albeit conscientiously made guess as to the true worth of an attorney, it is preferable to articulate objective, congressionally-inspired standards in advance. Proper application by the district courts in the first instance should minimize the need for appellate review. In the words of one scholar, "a more rational and consistent approach among the courts would greatly reduce the existing necessity of relitigating the ground rules in each case."[108]

### 3. The Dissent

Although we have fully answered the dissent's objections at the appropriate points in our opinion, we feel compelled to point out two conceptual flaws which, we respectfully submit, permeate the dissent's analysis. First, in claiming that our approach contravenes the "unambiguous intent of Congress,"[109] the "express admonition" of the Supreme Court,[110] and "an unbroken line of cases in this circuit,"[111] the dissent vastly overstates its case. Because our task is one of statutory construction, and because legislative history is a uniquely valuable tool in that endeavor, a closer look at the dissent's argumentation on this point provides a useful illustration.

In claiming that our construction is foreclosed by the legislative history, the dissent accurately points out that the Senate Committee Report cited three district court cases as correctly applying the "appropriate standards."[112] But the dissent's quotation from the first case, *Stanford Daily v. Zurcher*,[113] to the effect that "[t]his court does not accept the attorneys' usual billing rates as *definitively* fixing their billing rates for this litigation,"[114] is beside the point because we do not consider it *definitive* either. Indeed, the district court in the very next sentence suggested, consistent with our analysis, why such rates should be only presumptively binding: "[T]he simple fact [is] that attorneys may be leaving the area of their professional expertise in taking on pro bono publico litigation and that, as a result, their billing rates should reflect this fact."[115] Because the attorney's rates

---

**107.** *See id.* at 36–37 & n. 13.

**108.** Berger, *supra* note 49, at 293.

**109.** Dissent at 31.

**110.** *Id.*

**111.** *Id.* at 32.

**112.** S.Rep. No. 1011, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913.

**113.** 64 F.R.D. 680 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

**114.** *Id.* at 684 (emphasis added).

**115.** *Id.* This passage, which applies a private firm's historical billing rate to litigation undertaken pro bono publico, answers the dissent's query as to the status of a private law firm acting in this capacity. *See* dissent at 33 n. 4. Our decision in *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir.1980) (en banc), also adopted the customary billing rate of a law firm working

"compare[d] favorably with the rates charged by other attorneys in this area ... [and because] these rates reflected the attorneys' expertise," the judge granted the fee request with only a minor modification.[116] A clearer example of the methodology we outline today—reference to the customary billing rate followed by comparison to the prevailing community rate to ensure that the attorney's customary rate is reasonable—could hardly be hoped for.

The dissent also cites *Swann v. Charlotte-Mecklenburg Board of Education*[117] for the proposition that "Congress did not intend to use historical billing rates as a cap on fee awards."[118] The district judge may have based his award on the "[f]ees paid to opposing counsel,"[119] as the dissent suggests. But we will never know, because he also listed eight other factors, including such surrogates for historical billing rates as "[l]oss of other business" and "[f]ees customarily charged for similar services."[120] The mystery must remain unsolved because, after commenting casually on the eight factors, the judge concluded by saying: "Based on all the factors noted above ... I find that plaintiffs' counsel are entitled to a fee of $175,000.00 for their services."[121] Given the conclusory manner of this congressionally-approved fee calculation, it is not surprising that the Supreme Court has rejected the dissent's implicit assumption that Congress intended the methodology of these cases to be followed closely; otherwise, the Court could not have mandated the lodestar method of fee-setting in the face of *Swann*. The dissent therefore surely overstates its case to say that this decision forbids the use of custom-

ary billing rates as presumptively reasonable hourly rates. (The third case cited in the Senate Report, *Davis v. County of Los Angeles*, concerned a "privately funded non-profit public interest law firm" for which past billing rates were unavailable.[122] That court did not reach the question we decide today.)

More fundamentally, the dissent's reasoning—that because the legislative history does not explicitly endorse the approach we adopt today that it therefore precludes it—is difficult to fathom. To begin with, our approach, by in effect setting the reasonable hourly rate at the opportunity cost of litigating civil rights claims, fully satisfies Congress's objective of encouraging meritorious litigation without awarding "windfall" fees. Even if not explicitly endorsed by the text of the statute and the history of its passage, the dissent cannot logically leap to the conclusion that our construction is forbidden. The committee reports and floor debate do not explicitly endorse the "true value" formula that the dissent would affirm either. Rather than hiding behind a nonexistent congressional intent, the dissent should defend its preferred fee setting approach on the basis of its consistency with the statutory scheme and with recent pronouncements of the Supreme Court.

Second, the dissent's approach is schizophrenic. It seeks to distance itself from use of customary billing rates because it feels incompetent to "plumb the mysteries of economic analysis,"[123] yet at the same time it endorses an approach that requires district judges to duplicate the free market

pro bono publico as the "reasonable hourly rate" for purposes of awarding attorneys fees, *see id.* at 887–88, 902, as the dissent recognizes, *see* dissent at 34 n. 6.

**116.** 64 F.R.D. at 685. In arriving at its fee award, the district court never considered the criteria advanced by the dissent to determine the "true value" of attorneys' services. Apparently, the judge made his calculation based solely on "affidavit[s] [submitted by plaintiff's attorneys which] ... provide information concerning their individual billing rates for fixed-fee services." *Id.* at 684.

**117.** 66 F.R.D. 483 (W.D.N.C.1975).

**118.** Dissent at 32 n. 3 (citation omitted).

**119.** 66 F.R.D. at 485.

**120.** *Id.* at 486.

**121.** *Id.*

**122.** 8 Empl.Prac.Dec. (CCH) ¶ 9444, at 5049 (C.D.Cal.1974).

**123.** Dissent at 32.

and ascertain an attorney's "true value" by comparing his skill, experience, and reputation to lawyers who bill paying clients. The dissent is willing to *compare* fee applicants to private sector attorneys, but it is curiously unwilling to use the market rates of the attorneys themselves. The dissent's attempt to unhook the customary billing rate from both private and nonprofit law firms must founder, because the entire lodestar framework mandated by the Supreme Court makes private attorneys' hourly rates the baseline for comparison. After all, "[i]n order to establish a market value for the services of a lawyer who does not have an hourly rate set by the marketplace, it is necessary to look to the rate charged by comparable attorneys who do." [124]

The implication of this point is important. Contrary to the dissent's accusations, the approach set out above does not discriminate between private and nonprofit law firms—the inquiry is the same. For private law firms, the prevailing market rate for the firm's services is presumptively found in the firm's customary billing rates. For nonprofit law firms, the objective is still to determine the prevailing market rate for that firm's services; but because such firms have no past billing history, a proxy for the actual market rate of the firm's services must be found by examining the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.

### 4. Summary

■ When the costs of litigating attorneys fees are unavoidable, and they may be when firms with no relevant billing histories are involved, they must be tolerated.[125] But when fixed market rates already exist, there is no good reason to tolerate the substantial costs of turning every attorneys fee case into a major ratemaking proceeding. *In almost every case, the firms' established billing rates will provide fair compensation.* The established rates represent the opportunity cost of what the firm turned away in order to take the litigation; they represent the lawyers' own assessment of the value of their time. To the extent unusual circumstances exist, those exceptional circumstances are best taken into account in adjustments of the lodestar.

The trial court here improperly based the hourly rates on its own unguided assessment of the "true value" of the attorneys' services. The proper approach is simpler and less arbitrary, as we have set forth above, and which may be summarized: The party seeking compensation should provide evidence of the rates charged by the firm for performing similar work in private representations. As the Supreme Court said in *Blum*, "the critical inquiry in determining reasonableness is ... the appropriate hourly rate. And the rates charged in private representations may afford relevant comparisons." [126] When the firm has been engaged "in private representation," as Bredhoff & Kaiser has been, we can think of no more "relevant comparison" that "the rates charged in private representation" by Bredhoff & Kaiser itself. Next, the court may then "bracket" this rate by establishing that it falls within the rates charged by

---

**124.** Berger, *supra* note 49, at 324.

**125.** These costs include undercompensating as well as overcompensating lawyers. The hourly rates found "reasonable by courts have varied by a remarkable degree. *See supra* pp. 14–16. *Compare King v. New Hampshire Dep't of Resources and Economic Dev.,* 562 F.2d 80, 83–84 (1st Cir.1977) (Coffin, J.) (fee award averaging $11 per hour upheld as reasonable), *with Wehr v. Burroughs Corp.,* 477 F.Supp. 1012, 1023 app. A (W.D.Pa.) (fees up to $125 per hour approved), *aff'd as modified,* 619 F.2d 276 (3d Cir.1980). *See generally* B. SCHLEI & P. GROSSMAN,

EMPLOYMENT DISCRIMINATION LAW 1501 (1983) ("Hourly rates vary dramatically." (footnote omitted)); *id.* at 1501–03 n. 61 (citing cases). The reported cases indicate that many courts award fees that are below the attorney's normal hourly rates. In this circuit, the United States Attorney has resisted paying more than $75 per hour to any attorney, regardless of that attorney's normal billing rate.

**126.** *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 1547 & n. 11, 79 L.Ed.2d 891 (1984).

other firms for similar work in the same community. Again, as Justice Powell said in *Blum* (in the context of determining a non-commercial rate), "the burden is on the fee applicant to produce satisfactory evidence ... that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."[127] *So long as the firm's own rate falls within the rate brackets, it is the market rate* for the purposes of calculating the lodestar. Any adjustments or enhancements should be made during the "subjective" phase of the fee setting procedure, using the guidelines set forth in *Hensley* and *Blum.*[128] Such adjustments should be made only for exceptional circumstances, and should be carefully and precisely explained.

■ The above approach is in complete accord with the congressional objective as interpreted by the Supreme Court. The hourly rates Bredhoff & Kaiser lawyers were happily receiving from other clients were surely "adequate to attract" them to this litigation; substantially more, as was granted by the trial court here, would produce the very windfall Congress and the Supreme Court have said should be avoided.[129] Because the district court applied an incorrect legal standard in that it relied not at all on the past billing histories of the law firms representing the prevailing plaintiffs, and instead attempted to assess the "true

value" of their services, we must reverse and remand.

### B. *Allotment of Tasks*

The appellants also object to the allotment of tasks between partners, associates, and paralegals. They object that the fees have artificially been elevated because partners have performed many tasks that would have been performed by associates at other law firms.[130] The crux of their argument is that setting the "true value" of a firm's services requires an analysis somewhat more probing than looking merely to the hourly rates; it requires an analysis of the firm's staffing patterns. The analysis requested is not far different from that which a sophisticated client—who recognizes that the lowest hourly rate will not always generate the lowest overall bill— would make in an arm's length negotiation.

If this court were to adopt the approach followed by the district court, there would be some merit to this argument. Hourly rates—whether for lawyers or for steelworkers—are to some degree a function of productivity. Productivity, for lawyers and steelworkers alike, reflects both individual efficiency and capital investment. Some lawyers are simply more efficient than others; others are more productive because sophisticated support systems allow them to produce more in less time than other lawyers without such support. Given that the level of support could affect the productivity of two lawyers of equal ability, a

---

**127.** *Id.*

**128.** Laffey cross-appeals, seeking to have the issue of enhancement of the lodestar remanded if the hourly rates are reduced. In *Blum* the Supreme Court held that an upward adjustment for quality may be justified "only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'" *Id.* at 1549. In this case, there simply was no specific evidence that plaintiffs' counsel provided services that were "superior" to those services provided at the firms' normal rates. In addition, the trial judge expressly found that "[t]he case ... simply was not 'exceptional' as that term has been defined by the Court of Appeals."

*Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 377 (D.D.C.1983). Therefore, *the district judge has already found* that under the controlling law established by *Blum* plaintiffs' counsel do not qualify for a "quality" multiplier.

**129.** And give added endorsement to the famous description by Lord Denning M.R. of the attorney fee system in the United States: "As a moth is drawn to the light, so is a litigant drawn to the United States. If he can only get his case into their courts, he stands to win a fortune. At no cost to himself; and at no risk of having to pay anything to the other side." *Smith Kline & French Laboratories Ltd. v. Bloch,* [1983] 1 W.L.R. 730, 733 (C.A.1972).

**130.** Brief of Northwest Airlines, Inc. at 46–51.

"true value" analysis of a firm's worth would have to include examination of the factors affecting productivity in the firm's structure. The same lawyer might have an equal value on a *per case* basis whether as a single practitioner with one secretary or in a large firm supported by legal associates, paralegals, a battery of secretaries, word processing equipment and automated legal research tools. However, that same lawyer would obviously be worth much more *per hour* if he were working in a large firm supported by every conceivable human and electronic aid than as a solitary practitioner with minimum assistance.

Experienced partners, for example, are generally considered most productive when their time is spent supervising less experienced attorneys. In this case, however, nearly two-thirds of the hours billed were billed by partners. This indicates that the lower priced—if equally talented—partners here did work that would not have been done by partners at a more highly leveraged firm. A private client would take such factors into account in comparing fees. A court setting a "true value" on a firm's services would be obligated to consider such factors—and they are almost infinite in their variability—in constructing the ideal fee package for the firm.

■ However, *by deferring to the market we have obviated the need to set a "true" staffing pattern to go along with a "true value" set on the firm's services.* The record indicates that Bredhoff & Kaiser staffed this case much as it would a case for a paying client. The market has found Bredhoff & Kaiser's staffing patterns—combined with their normal hourly rates—to produce an overall bill in accord with their market value. This market-tested allotment of both tasks and fees is not to be questioned by this court so long as it is reasonable.

131. *See id.* at 52–62.

132. *Id.* at 52.

133. Leubsdorf, *The Contingency Factor in Attorney Fee Awards,* 90 Yale L.J. 473, 481 (1981) (footnotes omitted).

## C. *Contingency Adjustment*

■ The trial court doubled the lodestar on the merits to account for a "risk factor." Northwest argues that this adjustment was unwarranted.[131]

### 1. Contingency Multiplier

The appellants characterize the contingency award as reflecting only the odds at the outset of the case. They claim that "[t]he district judge reasoned that, because he believed that plaintiffs' chance of success at the outset of the litigation was 50%, a doubling of the lodestar was mathematically necessary to account for the counsel's risk." [132] Under this approach, the contingency multiplier represents simply the inverse of the risk factor.

Such an approach is presumably based on a goal of making "fee award cases as attractive to lawyers as their 'usual' cases." Taken to its logical extreme, such an approach would engender results which would be at odds with current practice. For

> if the plaintiff's chance of success was less than one-half, the fee should be multiplied by a factor greater than two. In theory, there should be no upper limit to this process: when the chance of success was one in fifty, the fee should be multiplied by fifty, and so forth. But commentators and courts have not gone this far.[133]

Other consequences of this approach lead to graver criticisms. The award would be greatest when the losing party was most unreasonable in litigating its case, creating a perverse penalty for those least culpable.[134] In most cases the chances of winning could not be set with anything approaching mathematical precision, and so vast increases in attorneys would derive

134. *See Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983); Leubsdorf, *supra* note 133, at 488–90.

from a spurious mathematical base.[135] Even if the chances of winning could be precisely assessed, moreover, the net effect of such a system would be to make a marginal case as attractive to bring as a very strong case—leading, one commentator has speculated, to a situation in which every conceivable claim would be litigated, subject only to the ability of the courts to handle the burden.[136] If the capacity of the judicial system remained constant, these marginal claims would displace civil rights cases with a greater probability of success. The net effect would be a dilution in the deterrent force of the civil rights statutes.

Had the trial judge applied such a crude multiplier, he clearly would have misapplied the controlling law. The statute allows awards only to prevailing parties. To multiply all awards to account for the risk of losing would ultimately generate a pool of legal fees sufficient to compensate all attorneys bringing all civil rights suits; the fund generated would differ from insurance only in the manner in which it was collected and distributed.[137] While such a scheme is arguably desirable, it clearly is not the one adopted by Congress.[138]

The Supreme Court has emphasized the congressional intent to award fees only to prevailing plaintiffs. In *Hensley* the Court ruled that no attorneys fees could be granted for claims unrelated to those for which relief was granted. The Court reasoned that "[t]he congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." [139] The Court later added that "Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill." [140]

The same logic which restricts compensation to those portions of a lawsuit directly related to the relief procured also forbids multiplying attorneys fees so as effectively to compensate counsel for other, losing claims which may be brought. The prevailing party may expect full compensation for prevailing claims; there is no provision for compensating losing, unrelated claims in the same case, or other losing cases which might or might not involve the same par-

---

**135.** *See* Leubsdorf, *supra* note 133, at 485–88.

**136.** *See id.* at 491–93, 499.

**137.** *See Murray v. Weinberger*, 741 F.2d 1423, at 1430–1431 (D.C.Cir.1984). It perhaps bears noting that a multiplier approach would be far less fair in its distributional effects than an insurance system. Bringing a promising claim that loses would yield no compensation to the attorney; bringing a near-frivolous claim that wins would yield exceptionally high attorneys fees to the prevailing party. The net effect is a small transfer of wealth from the least reasonable losing parties to the least reasonable prevailing parties, and a substantial transfer of wealth from the most reasonable losing parties to the least reasonable prevailing parties. There is no reason to assume that the distributive effects would average out over time.

**138.** The Court [in *Blum*] raised a further question, however, of "whether the risk of not being the prevailing [sic] party ... may ever justify an upward adjustment." [*Blum v. Stenson*, —— U.S. ——, 104 S.Ct. 1541, 1550 n. 17, 79 L.Ed.2d 891 (1984).] This question is perceptive; it focuses attention on the intent of the Fees Act. Only "prevailing parties" are

to qualify for a "reasonable fee" in the first place. This "prevailing" threshold was the mechanism chosen by Congress to deter meritless litigation. Supplying a bonus for accepting marginal or risky cases would certainly be at odds with this policy. In fact, a contingency bonus could attract competent counsel away from prosecuting clear violations of rights in favor of cases with a higher potential award. If the contingency argument is based on the notion that fees in this risky case may offset expenses of other unsuccessful suits, the problem of encouraging marginal litigation is compounded by the reasonable question of "why the subsidy [for unsuccessful litigation] should come from the defendant in another case."
Address by Randall Rader, Second Institute on Federal Civil Procedure (Houston, Tex. May 1984) (unpublished manuscript entitled *The Fee Awards Act of 1976: Examining the Foundation for Legislative Reform of Attorney Fees Shifting* 27) (footnotes omitted) (second quotation from Leubsdorf, *supra* note 133, at 489).

**139.** 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983) (footnote omitted).

**140.** *Id.* at 1941.

ties. Any crude multiplier derived simply from the plaintiff's chance of success must be rejected as contrary to the congressional scheme.

### 2. Contingency Enhancement

Laffey argues, however, that the district court employed a more sophisticated analysis than simply assessing the plaintiffs' initial chance of success. Laffey characterizes the relevant inquiry as looking not only to the initial outlook for success, but also to the magnitude of what was placed at risk. Under this more complex analysis, Laffey argues, the trial judge found that a doubling of the merits lodestar was required to compensate the plaintiffs fully in this particular case. In effect, Laffey argues, given the uncertainty of prevailing (and hence receiving payment) and the prospect of large outlays of time and money, a rational lawyer would expect twice the going rate to account for that uncertainty.[141]

Although a contingency *multiplier* would fully subsidize unsuccessful suits and encourage the filing of nonmeritorious claims, both effects in contravention of the statute's purpose and the Supreme Court's decision in *Hensley,* the propriety of an *enhancement* to the award is less clear. In *Stanford Daily v. Zurcher*[142]—which was cited by the Senate Committee Report as "correctly appl[ying]" the "appropriate standards"[143]—the court held that it "[c]learly ... must increase the fees award ... to reflect the fact that the attorneys' compensation, at least in part, was contingent in nature."[144] But the court's reason for making this adjustment was that "the contingent fee insures that counsel are compensated not only for their successful

efforts but also for unsuccessful litigation.... [O]ver the long run, substantial fees awards in successful cases will provide full and fair compensation for all legal services rendered to all clients."[145]

Obviously, the California district court's reasoning flatly contradicts the Supreme Court's holding in *Hensley* that unsuccessful counts (and suits) do not qualify for an award of attorneys fees under the Act. In *Blum,* decided this Term, the Court made the propriety of contingency enhancements ever more suspect by reserving the question in such a way as to indicate that it had grave doubts as to whether such adjustments should ever be made: "We have no occasion in this case to consider whether the risk of not being the prevailing party ... may *ever* justify an upward fee adjustment."[146]

Regardless whether contingency enhancements are ever warranted, it is clear in this case that a showing sufficient to qualify plaintiffs' counsel for an enhancement cannot be made. The Supreme Court and this court have made it clear that "enhancements" are to be awarded only in the exceptional case. The *Blum* Court, immediately after refraining from deciding whether contingency adjustments would be appropriate because the issue was not raised in the fee request, did "reiterate what was said in *Hensley,*" that "in some cases of *exceptional* success an enhancement award *may* be justified."[147] Following the Supreme Court's suggestion, this court applied "[t]he principle that only rare and exceptional circumstances can justify an upward adjustment of the lodestar"[148] to an enhancement made to reflect "the

**141.** Brief for Appellees at 50–68.

**142.** 64 F.R.D. 680 (N.D.Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

**143.** S.Rep. No. 1011, 94th Cong., 2d Sess. 6, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5908, 5913.

**144.** 64 F.R.D. at 686; *see supra* p. 13 & n. 64.

**145.** *Id.* at 685.

**146.** —— U.S. ——, 104 S.Ct. 1541, 1550 n. 17, 79 L.Ed.2d 891 (1984).

**147.** *Id.* at 1550 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)) (emphasis added).

**148.** *Murray v. Weinberger,* 741 F.2d 1423, at 1428 (D.C.Cir.1984).

contingency of payment due to the risk of losing on the merits." [149]

In this case, the district court applied an erroneous legal standard when it assumed that plaintiffs' counsel were *"entitled"* [150] to a contingency enhancement. As we stated only last month in *Murray v. Weinberger,* "an upward fee adjustment to compensate for the risk of losing—if ever appropriate (and *Blum* did not decide that it ever would be appropriate)—is permissible only in an exceptional case." [151] Whatever the Supreme Court meant by the term "exceptional," this case does not fall within its embrace. The district court found that the plaintiffs' initial chance of success was 50 percent.[152] *That chance of winning reflects the norm for litigated cases*—in the average case, one side will win, one will lose. *The level of risk was not unusual.* Since this case did not present an exceptional level of risk, no risk enhancement should be awarded.

## D. *Attorneys Fee Litigation*

Northwest objects to the magnitude of the award for litigating the attorneys fee issue. In addition to various specific objections, Northwest notes that more attorneys worked on the fee request than ever worked on the merits, and that more hours were billed on the fee request than were billed in any given year on the merits.[153]

We are, quite frankly, aghast at the hours devoted to the fee request. The award of fees for 3,400 hours of attorney time shows clearly that this fee request did turn into just the sort of "second major litigation" feared by both this and the Supreme Court; the prodigious consumption of lawyers' hours and judicial time should give pause to anyone concerned with the allocation of legal resources. And it is for this reason, aside from the fact that it is basically fair to all concerned, that we have settled on the fee per hour customarily charged for similar work by the law firm making the claim as the most objective market rate and simplest for the court to administer.

At the same time, we cannot say that the district court erred. Northwest objects to three major components of the fee award—the hours spent preparing an affidavit reciting the history of the case, time spent on interfirm meetings between the two firms involved in the fee request, and time spent in pre-application discovery.

■ The trial court adequately addressed each of these issues. The judge specifically noted that the lengthy affidavit recounting the case was useful in his disposition of the fee request; [154] he excluded those hours he felt were the result of unnecessary duplication caused by the entry

---

**149.** *Id.* at 1426; *see id.* at 1432.

The dissent's reading of *Blum* to say that contingency adjustments are appropriate in cases that are not exceptional is simply not the law of this circuit (as well as being an erroneous interpretation of *Blum,* we believe). *See id.* at 1432. Even before this court's decision in *Murray,* it would have been incorrect to sanction the routine award of contingency enhancements. In *Copeland* we observed that "an hourly rate underlying the 'lodestar' fee itself" may "comprehend[ ] an allowance for the contingent nature of the availability of fees." 641 F.2d 880, 893 (D.C.Cir.1980) (en banc). The lodestar figure may therefore inherently include an adjustment for the possibility of not prevailing on the merits, *see Murray v. Weinberger,* 741 F.2d 1423, at 1431; *Copeland v. Marshall,* 641 F.2d at 917–19 (Wilkey, J., dissenting), despite the diligent efforts of district judges to separate the two, *see National Ass'n of Concerned Veterans v. Secre-*

*tary of Defense,* 675 F.2d 1319, 1328 (D.C.Cir. 1982) (per curiam).

**150.** *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 378 (D.D.C.1983).

**151.** 741 F.2d 1423, at 1432 (D.C.Cir.1984). We remanded in *Murray* because, on the record in that litigation, the district court was not foreclosed from finding that case to be "exceptional" within the meaning of *Blum.* In this case, however, the trial court's factual findings indicate that this is *not* an exceptional case. The judge's findings in this regard are not an abuse of discretion.

**152.** 572 F.Supp. at 379.

**153.** Brief of Northwest Airlines, Inc. at 13, 64–65.

**154.** 572 F.Supp. at 368.

of another firm into the case;[155] and he examined the hours spent in discovery for reasonableness.[156] His assessment of what constituted reasonable litigation of the attorneys fee issue, while perhaps more generous than this court might find appropriate on *de novo* review, does not constitute an abuse of discretion.

### E. *Out-of-Pocket Expenses*

Appellants also challenge the award of certain litigation costs to the appellees. The gist of the appellant's argument is that only taxable costs may be awarded in addition to fees calculated with regard to the hourly rate.[157]

This interpretation is overly narrow. The compensation structure employed by most firms encompasses more than hours billed; various expenses incurred by the firm are passed through to clients. As several other courts have held, "[t]he authority granted in section 1988 to award a 'reasonable attorney's fee' included the authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." [158]

Since private, for-profit attorneys are involved, this court need not attempt to trace an unwavering line between those out-of-pocket expenses which are compensable and those which are not. The line of division—as with the hourly rate—should fall where the market has placed it. Some law firms routinely pass such costs on; others charge slightly higher fees and absorb these costs. It would grant a windfall to attorneys to reimburse them for expenses which normally are absorbed as part of their overhead; it would penalize them to deny compensation for expenses which they expect to pass directly to clients. The appellees are entitled to these costs upon a showing that such costs are of a type passed on by the firms involved to private clients.

One exception exists to this general rule—those costs incurred by plaintiff Laffey herself in the course of litigating this lawsuit. These expenses are not of a type which might be subsumed in legal fees; they were absorbed directly by plaintiff Laffey. The legislative record shows beyond doubt that prevailing plaintiffs should be compensated for reasonable expenses incurred in litigating their claim. The costs incurred by Laffey herself are therefore compensable.

The lost wages suffered by Laffey are no different in this respect from her actual out-of-pocket expenses. Her lost income effectively "paid" someone else to take her place so that she could pursue the litigation; not to compensate her for these costs might force her to choose between pursuing a Pyrrhic victory and foregoing a valid claim. This is precisely the dilemma from which Congress sought to free prospective plaintiffs.

### III. CONCLUSION

The district court erred in basing the hourly rates on the putative "true value" of the firms involved, rather than on those firms' market tested rates. The fee award must be recalculated according to the market rates established by those firms in their everyday practice. On the facts of this case no enhancements of those market rates are warranted. For those two major readjustments the case must be remanded. In all other respects, the district court's opinion is affirmed.

*So Ordered.*

J. SKELLY WRIGHT, Circuit Judge, dissenting:

The majority finds error in two aspects of the District Court's award of attorney fees pursuant to 42 U.S.C. § 2000e-5(k)

---

**155.** *Id.* at 369.

**156.** *Id.* at 370–71.

**157.** Brief of Northwest Airlines, Inc. at 72–75.

**158.** *Northcross v. Board of Educ.,* 611 F.2d 624, 639 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980).

(1982) and 29 U.S.C. § 216(b) (1982). First, drawing a sharp line between private and nonprofit law offices, the court concludes that, for the former, historical billing rates are virtually determinative [1] of the "reasonable hourly rate" component of the lodestar calculation required by *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980) (*en banc*). Second, the majority finds, despite the carefully reasoned and meticulously documented opinion of Chief Judge Aubrey E. Robinson, Jr., *see Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983), that the District Court abused its discretion in doubling the lodestar figure to account for the significant risk incurred by plaintiffs' attorneys of not prevailing and thus not recovering a fee.

In my judgment, neither conclusion is warranted under existing law. Given the unambiguous intent of Congress, recent pronouncements by the Supreme Court, and the controlling precedent in this circuit, there is simply no room for the majority's view that the amount of the fee award should turn on the nature of the practice the lawyer has chosen to follow rather than the customary fee prevailing in the community for lawyers of comparable skill, reputation, and experience. Nor can I agree that the District Court erred in its calculation of a contingency multiplier. The legislative history of the relevant attorney fees acts and the *en banc* decision in *Copeland, supra,* preclude the view that increasing the award to account for the risk of nonsuccess constitutes an error of law. *See also Blum v. Stenson,* ⸻ U.S. ⸻, ⸻, 104 S.Ct. 1541, 1550, 79 L.Ed.2d 891 (1984)

(Brennan, J., concurring). (Supreme Court decisions not yet appearing in U.S. Reports will hereinafter be cited only to Supreme Court Reporter.) Thus reversal is appropriate only if we find that the District Court abused its discretion. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) (opinion by Powell, J.); *Copeland, supra,* 641 F.2d at 901. Yet, presumably because the thoroughness of the District Court's opinion makes the task all but impossible, the majority makes no serious effort to justify its finding of abuse of discretion. Instead, under the guise of applying the appropriately deferential standard of review, the majority substitutes its judgment for that of the District Court. This approach not only disregards the clear mandate of the *en banc* decision in *Copeland,* but also, contrary to the Supreme Court's express admonition to avoid engendering a "second major litigation" over attorney's fees, *Hensley, supra,* 103 S.Ct. at 1941, serves to encourage disappointed fee litigants to persist in pursuing their claims in this court. Accordingly, I dissent.

## I

### A

Buoyed by its confidence in the inevitable beneficence and efficiency of the free market's "invisible hand," the majority holds that the District Court erred in awarding fees at variance with those charged other clients in private litigation. I agree that the appropriate inquiry is to determine the prevailing market rate for complex federal

1. The majority describes the methodology it adopts as "tying the 'reasonable hourly rate' to the firm's own billing rates." Majority opinion (maj. op.) at 18. At the last minute, however, the court steps back from holding that a private attorney's billing rate conclusively determines the maximum rate allowable for a fee award. Having determined the rates charged in private representation, the District Court "may then 'bracket' this rate by establishing that it falls within rates charged by other firms for similar work in the same community. * * * *So long as the firm's own rate falls within the rate brackets, it is the market rate.*" Maj. op. at 25 (emphasis in original). As a practical matter, however, it makes little difference whether the private billing rate is conclusive or merely is presumptively determinative of the market rate. As this case demonstrates, attorneys in a given community charge a wide range of rates. Almost invariably, the defendant will be able to find at least one private firm in the community that charges a lower rate than the fee applicant for similar work. Thus in all but the rarest cases "bracketing" the fee applicant's billing rate is an empty gesture that will yield results no different from conclusively setting the reasonable hourly rate as equivalent to the firm's historical billing rate.

litigation. *Blum v. Stenson, supra,* 104 S.Ct. at 1547 n. 11. I need not, however, plumb the mysteries of economic analysis to evaluate the validity of the majority's view that the historical billing rate of a private law firm necessarily corresponds with the market value of its services. In my judgment, the analysis adopted by the majority is expressly foreclosed by the legislative history of the attorney fees acts, Supreme Court precedent construing those acts, and an unbroken line of cases in this circuit.

The task of determining the appropriate methodology for evaluating the reasonableness of fee awards "begins and ends with an interpretation of the attorney's fees statute." *Blum, supra,* 104 S.Ct. at 1546. Congress has made clear its intention that the same standards govern under all of the myriad statutes permitting the award of attorney fees to prevailing parties.[2] *See, e.g.,* S.Rep. No. 94–1011, 94th Cong., 2d Sess. 1, 6 (1976) (hereinafter cited as *Senate Report*) (42 U.S.C. § 1988 adopted to achieve consistency in attorney fees provi-

2. *See* E. Larson, Federal Court Awards of Attorney's Fees 301–302 (1981) (listing 54 federal statutes authorizing award of attorney's fees).

3. The *Senate Report* also cited *Swann v. Charlotte-Mecklenburg Board of Education,* 66 F.R.D. 483 (W.D.N.C.1975), as applying the correct methodology. In *Swann* the court, in determining the amount of the fee award, looked to the rate charged by opposing counsel. *Id.* at 485. Like *Stanford Daily, Swann* makes clear that Congress did not intend to use historical billing rates as a cap on fee awards. E. Larson, *supra* note 2, at 196.

   The majority's reading of *Stanford Daily* to support its holding, maj. op. at 22–23, requires the use of mirrors. The *Stanford Daily* court—consistent with the approach adopted in *Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir. 1980) (*en banc*), applied by the District Court in this case and endorsed in this dissent—looked at the historical billing rates of the private attorney and concluded that they conformed to the customary rate prevailing in the community. It did not suggest that the billing rate was dispositive provided only that some attorney somewhere could be found who charged more than that fee and some attorney somewhere could be found who charged less. No such mechanical and artificial "bracketing" was applied. Indeed, the court took pains to explain that the billing rates of the private attorney were the appropri-

sions of civil rights laws); *Hensley, supra,* 103 S.Ct. at 1939 n. 7; *Jordan v. U.S. Dep't of Justice,* 691 F.2d 514, 523 n. 89 (D.C.Cir. 1982). Yet the legislative history of *none* of the attorney fees statutes offers support for the majority's conclusion that a private attorney's historical billing rate is presumptively congruent with the market value of his services. Indeed the legislative history clearly negates precisely the analysis the majority today adopts. In enacting the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988 (1982), Congress indicated that "[t]he appropriate standards [for measuring the reasonableness of attorney fees] * * * are correctly applied in such cases as *Stanford Daily v. Zurcher,* 64 F.R.D. 680 (N.D.Cal.1974) * * *." *Senate Report* at 6. In *Stanford Daily* the court, in determining the appropriate fee award to a *private* attorney, explicitly stated, *"This court does not accept the attorneys' usual billing rates as definitively fixing their billing rates for this litigation."* 64 F.R.D. at 684 (emphasis added).[3]

ate yardstick only because they "compare favorably with the rates charged by other attorneys in this area for work involving complex questions of fact and law." 64 F.R.D. at 685. To defend its strained reading of the case, the majority must seize on the word "definitively" in the statement in *Stanford Daily* that "[t]his court does not accept the attorneys' usual billing rates as definitively fixing their billing rates for this litigation." *Id.* at 684. As argued earlier, *see* note 1 *supra,* there is no meaningful distinction in practice between "presumptively" conclusive and "definitively" conclusive.

   The majority misreads this dissent to suggest that "because the legislative history does not endorse the approach we adopt today that it therefore precludes it." Maj. op. at 23. By incorporating by reference the methodology of the cases cited in *Senate Report,* Congress revealed its intent that historical billing rates not unilaterally determine reasonable hourly rates in civil rights attorney fee awards. Relying on a transparently empty distinction between "presumptively" and "definitively" conclusive, the majority today adopts a methodology directly at odds with that intent. I cannot say it more plainly.

Nor will the legislative history support the majority's view that Congress endorsed a different calculus for measuring the reasonableness of attorney fees depending on whether counsel is a public interest lawyer or is in private practice.[4] As the Supreme Court unambiguously found in *Blum, supra,* "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." 104 S.Ct. at 1547. For all attorneys, whatever the nature of their practice, the District Court's task is to determine whether the "requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 1547 n. 11. *See also Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444 (C.D.Cal.1974) (cited in *Senate Report* at 6 as applying the appropriate standard). While the rates charged in private representations "may afford relevant comparisons," *Blum, supra,* 104 S.Ct. at 1547 n. 11, the billing practice of the law office is merely one component in an otherwise essentially objective calculation. In many instances rates charged private clients will serve an evidentiary function of substantiating or rebutting other evidence adduced in the fee request, and thus will be a valuable indicator of prevailing rates in the community. *Blum* and the legislative history, however, quite simply leave no room for the conclusion that the District Court commits an error of law by awarding attorney fees that are at variance with fees charged by the private attorney in other litigation.

I readily acknowledge, as has the Supreme Court, that the determination of the market rate is "inherently difficult." *Id.* Perhaps also, though I have my doubts,[5] the methodology proposed by the majority is simpler and more administrable than that envisioned by Congress. But that, of course, is irrelevant given the clarity of the congressional design. In my judgment, "[t]he Court has simply fixed upon what it believes to be good policy and then patched together a rationale as best it could." *Washington Metropolitan Area Transit Authority v. Johnson,* 104 S.Ct. 2827, 2837, 81 L.Ed.2d 768 (1984) (Rehnquist, J., dissenting). Indeed, had Congress intended so straightforward an approach as equating market rates with historical billing rates, it would have said so. That it did not is itself a strong indication that a law office's billing practice is to be but one consideration among many in the required calculation.

In an effort to align its policy judgment with the legislative history, the majority notes that Congress explicitly admonished courts to guard against fee awards that "produce windfalls to attorneys." *Senate Report* at 6. To award appellees a fee in excess of that charged other clients in private practice, the majority concludes, would constitute just such a windfall. Maj. op. at 16. Whatever its appeal in the abstract, this reasoning was expressly rejected both by the Supreme Court and by this court sitting *en banc.* In *Blum* the Court brushed aside the suggestion that

---

4. Applying a different methodology depending on whether the fee applicant can be characterized as a private lawyer with regular billing rates, maj. op. at 24–25, is troubling for other reasons in addition to the plain incompatibility of this approach with the congressional design. First, the District Court will often face a difficult definitional problem. The status of the private attorney acting *pro bono publico,* for example, is not clear. Second, the majority's methodology will often generate anomalous results. It is entirely conceivable that the rate awarded a first year lawyer at a Legal Aid office would exceed that awarded to a vastly more experienced attorney whose practice, though

private, was deliberately geared towards low paying clients. Indeed, the majority's disposition seems to assure precisely this result. In *Blum v. Stenson,* 104 S.Ct. 1541, 1544 n. 4, 79 L.Ed.2d 891 (1984), the Supreme Court upheld a resonable hourly rate of $105 per hour to a Legal Aid Lawyer with one and a half years of litigating experience. This amount appears to exceed the average fee for Bredhoff & Kaiser *partners* with vastly more extensive experience. Brief for appellees at Appendix B. Congress did not intend such an incongruous result.

5. *See* text at 36–37 *infra.*

the correct fee for a Legal Aid office is the cost of rendering the service plus a reasonable profit. 104 S.Ct. at 1546 n. 6. The appropriate rate for Legal Aid attorneys, no different from those in private practice, is that "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 1547 n. 11. Even if application of the standard yields income in excess of that ordinarily received by the law office, this result cannot be "viewed as the kind of 'windfall profits' [Congress] expressly intended to prohibit." *Id.* at 1547.

*Copeland v. Marshall, supra,* 641 F.2d 880 (*en banc*), a case involving a *private* law firm,[6] makes this point with even greater clarity. The court observed that "paying low-salaried attorneys the prevailing market rate normally will yield a larger fee than that to which they are accustomed," but found "no flaw" in this result. *Id.* at 899. In fact, the court concluded, computing fees "differently depending on the identity of the successful plaintiff's attorney" would produce a windfall for the *defendant. Id.* In many instances the incentive of the employers not to discriminate would be diminished if fee awards are made to turn on the nature of plaintiff's

counsel's practice. *Id.* Moreover, the defendant is "subject to a lesser incentive to settle a suit without litigation than would be the case if a high-priced private firm undertook plaintiff's representation." *Id.*[7]

Though the juxtaposition in the above quoted passage is between a "private" and a "public interest" firm, the reasoning is wholly applicable to the case of a private firm whose lower rates reflect "personal professional interests and the ability of [its] clients to pay." *Nat'l Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1325 (D.C.Cir.1982) (*per curiam*).[8] No less than when the plaintiff is represented by a public interest firm, the defendant's incentive to cease discriminating or settle will be proportionally less if he knows he will benefit from the happenstance that plaintiff's counsel historically charged lower fees than those prevailing in the community.

Indeed, in case after case in this circuit the court has given short shrift to the connected arguments that a bright line separates public interest and private law firms, and that, for the latter, the market rate presumptively is tied to the historical billing rate. The majority's adoption of

---

6. *Copeland* involved the fee request of a private firm acting *pro bono publico.* 641 F.2d at 882 n. 1.

7. The majority argues that under the methodology it adopts the parties will have a greater incentive to settle because the reasonable hourly rate will be more predictable. Maj. op. at 21–22. As discussed in text at 36–37, I have little confidence that setting fees according to historical billing rates will be any more predictable than the current approach. In any event, even more important than providing an incentive to settle on the amount of attorney fees *after* liability for a civil rights violation has been established is the statutory objective of encouraging potential defendants to cease violating civil rights in the first place. *Copeland* recognizes that the prospects of accomplishing the latter goal decrease significantly if the potential defendant assumes that the costs of continuing its course of action and defending the civil rights suit will be less simply by virtue of the nature of the practice plaintiff's private counsel has chosen to pursue.

8. Repeatedly, this court has recognized that some attorneys bill at rates below those obtain-

able in the market because their clients serve the public interest. *Nat'l Treasury Employees Union v. Nixon,* 521 F.2d 317, 322 (D.C.Cir.1975) (Wilkey J., writing for a unanimous court); *Sierra Club v. Gorsuch,* 684 F.2d 972, 975 (D.C.Cir. 1982), *rev'd on other grounds sub nom. Ruckelshaus v. Sierra Club,* 462 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983). Nonetheless, the majority concludes that weighing this consideration in the fee calculation is inappropriate because it "invites courts to reward those plaintiffs who represent causes the judge involved finds estimable." Maj. op. at 14 n. 69 (emphasis deleted). But this argument assumes its own conclusion. The trial court's task is not to weigh which causes it finds deserving but objectively to determine the rate prevailing in the community for similar services. If the court finds a differential between the firm's billing rate and the prevailing rate, it may reflect the firm's choice to bill its public interest clients below market rates. But at no point in the calculation is the court asked to pass on whether it approves or disapproves of the causes the firm has chosen to represent.

these twin propositions in the teeth of an unbroken line of contrary precedent is, to say the least, startling. In *Nat'l Treasury Employees Union v. Nixon*, 521 F.2d 317, 322–323 (D.C.Cir.1975) (Wilkey, J., writing for a unanimous court), the court noted that where private counsel "serve organizations for compensation below that obtainable in the market because they believe the organizations further the public interest," upward adjustments in the attorney's billing rate are necessary to align the compensation with its reasonable market value.[9] *See also Nat'l Ass'n of Concerned Veterans v. Secretary of Defense, supra,* 675 F.2d at 1326 (where counsel customarily exercises billing judgment by not billing at

the market rate, this factor must be considered in calculating appropriate rate). Similarly, in *Sierra Club v. Gorsuch*, 684 F.2d 972, 975 (D.C.Cir.1982) (*per curiam* ), *rev'd on other grounds sub nom. Ruckelshaus v. Sierra Club*, 462 U.S. 680, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983),[10] this court observed that *no* evidence of historical billing rates to private clients had been submitted to support the fee request, but found such submissions unnecessary where the private attorney represents primarily nonprofit public interest organizations.[11] It is difficult to imagine more explicit refutation of the proposition that rates charged by private attorneys presumptively coincide

---

**9.** The organization referred to in *National Treasury Employees,* as in the instant case, was a union.

**10.** The majority labors mightily to distinguish away the line of precedent in this circuit that unambiguously conflicts with its approach. Maj. op. at 14–15 n. 69. The decisions, however, simply will not support the majority's strained reading.

In *Sierra Club v. Gorsuch, supra* note 8, 684 F.2d at 975, the court did not even require a private lawyer to submit records of his historical billing practice. The majority dismisses this clear refutation of its methodology on the ground that the attorney had no "established billing practice." Maj. op. at 14 n. 69. One searches the opinion in vain for documentation of this point. In fact, the attorney had an extensive private practice "representing primarily environmental orgnizations and Indian tribes before state and federal courts." 684 F.2d at 975. Nothing in the opinion suggests the absence of an established billing practice. Given the holding in *Gorsuch* that submissions of billing rates of private attorneys are not required, I simply do not understand how the majority can hold *as a matter of law* that historical billing rates are presumptively conclusive of the reasonable hourly rate.

The majority's treatment of *Nat'l Treasury Employees Union v. Nixon, supra* note 8, is equally unconvincing. That the award in *National Treasury Employees* was not pursuant to a statute is entirely irrelevant. It is an undisputed truism to suggest that the legislative history of the statutes relevant to this case reveals Congress' intent to avoid "windfalls" for attorneys. In its numerous invocations of that phrase, however, the majority entirely fails to mention the Supreme Court's crystal-clear holding that *paying attorneys more than their usual rate is not the kind of "windfall"* Congress intended to

preclude. *Blum v. Stenson, supra* note 4, 104 S.Ct. at 1547.

The majority's reading of *Nat'l Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319 (D.C.Cir.1982) (*per curiam* ), to support its holding requires a remarkable feat of interpretive sleight-of-hand. In *Concerned Veterans* the court listed numerous evidentiary sources the District Court may look to in establishing the prevailing community rate, including rates charged by other lawyers in comparable cases and recent fee awards by courts. Historical billing rates *"may* provide important substantiating evidence." *Id.* at 1326 (emphasis added). But the case simply does not suggest that the market rate is presumptively congruent with the attorney's billing practice. Maj. op. at 17 n. 86.

Nor can the majority's holding coexist with the *en banc* decision in *Copeland v. Marshall.* As in the recent decision in *Murray v. Weinberger,* 741 F.2d 1423 (D.C.Cir.1984), the fee in *Copeland* did correspond with the fee generally charged by the firm. But as *Copeland* makes explicit, 641 F.2d at 902, the District Court must look at evidence of fees charged by other lawyers engaged in comparable litigation in addition to the firm's historical rates. The court in *Copeland* did not undertake a mechanical "bracketing" of the firm's rate. It merely used that rate as one factor among many in determining the hourly rate prevailing in the community. Indeed the entire thrust of the analysis is that the rates charged by attorneys are not presumptively dispositive.

**11.** *See also Donnell v. United States,* 682 F.2d 240, 251–252 (D.C.Cir.1982) (Wilkey, J., writing for a unanimous court) ("some attorneys may receive fees based on rates higher than they normally command if those higher rates are the norm for the jurisdiction in which the suit was litigated"), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983).

with the "reasonable hourly rate" for their services.

### B

In sum, the clear intent of Congress and controlling precedent in the Supreme Court and this circuit leave little room for a free-ranging policy analysis of the "best" method for determining reasonable hourly rates under the attorney fees acts. Even if the issue were an open one—and, most emphatically, it is not—I am not persuaded by the policy arguments advanced by the majority to support tying the reasonable hourly rate to the firm's own billing rate.

The majority's reasoning reduces to the view that setting hourly rates according to the established rate is easier and less arbitrary to administer. The court effectively discards the methodology applied in this circuit without exception since *Copeland* because it considers that approach to be a "charade," an "arbitrary divination," and a "complex and expensive overlay of delusive mathematical form." Maj. op. at 19–20. We are told that a series of benefits will flow from the adoption of a more "predictable" approach, including the avoidance of a second major litigation over attorney fees and a generally more accurate measure of the market value of the legal services rendered.

In my judgment, the promise of greater predictability and ease of administration is largely illusory.[12] At first glance, using a private firm's historical billing rate as a touchstone for determining market value seems elegantly simple. On closer inspection, however, the proposed approach proves no less difficult and no more precise than the established inquiry of ascertaining rates "prevailing in the community for similar services by lawyers of comparable

skill, experience and reputation." *Blum, supra,* 104 S.Ct. at 1547 n. 11. Many private firms have no uniform billing rate clearly etched in stone. *Concerned Veterans, supra,* 675 F.2d at 1325. Moreover, as a practical matter there is often substantial play in the joints of even the most established billing practice. The rate may well depend on the nature of the service rendered, the relationship with the client, its ability to pay, or myriad other considerations. In many instances the rate charged by a firm may have changed substantially during the course of the litigation that is the basis of the fee request. The changes may reflect the rising or sinking fortunes of the firm or the effects of inflation. *See, e.g., Concerned Veterans, supra,* 675 F.2d at 1325 ("inflation perforce induces rapid changes in billing practices"); E. LARSON, FEDERAL COURT AWARDS OF ATTORNEY'S FEES 191 (1981). Indeed, in this very case litigation on the merits wended its way through the courts for over 14 years, largely coinciding with a period of rampant inflation. In short, the seemingly simple variable of the private firm's historical billing rate often will prove to be a rapidly shifting, multi-determined complex of figures. It cannot be said with certainty that focusing on historical billing rates will generate fewer discovery requests, less litigation, and greater prospects for negotiated settlement than the methodology the majority today supplants. Indeed, in *Copeland,* 641 F.2d at 896, the court rejected a "cost-plus" approach to setting attorney fees precisely because it would necessitate considerable litigation over the inner workings of a law firm.

Thus I remain unconvinced that the approach endorsed by the majority is more administrable or will prevent the fee application from devolving into a "second major

---

**12.** The majority suggests that rather than " 'nickel and diming' the guidelines" it offers, I should "flesh out" the approach I endorse. Maj. op. at 20. To do so would be entirely superfluous. The approach I defend is that which was announced by the court *en banc* in *Copeland* and, since that decision, has been successfully applied in dozens of cases, including this one. It is the majority that effectively abandons the

settled law of this circuit, and the burden is thus on it to advance a policy argument so weighty that it justifies creating an internal conflict in the law of this circuit. In my judgment, that burden has not been carried. Rather than feeling "incompetent," maj. op. at 23, to engage in a free-ranging policy analysis, I simply do not feel I have license to do so in this case.

litigation." Maj. op. at 21, *quoting Hensley v. Eckerhart, supra,* 103 S.Ct. at 1941. Indeed, there is a certain irony in the court's reasoning, for a virtually inevitable consequence of the majority's effort to make new law in this case is to give disappointed fee litigants the clear message that even if they don't prevail in District Court under the controlling legal standard, they should continue to press their claims vigorously at the appellate level.[13]

In my view, the better approach is also the required approach. Consistent with the standard set out in *Copeland* and the method of proof enunciated in *Concerned Veterans,* the fee applicant must provide specific evidence of the prevailing rate for comparably complex federal litigation. Relevant documentation may include "affidavits reciting the precise fees that attorneys with similar qualifications have received," and "[r]ecent fees awarded by the courts or through settlements to attorneys of comparable reputation." *Concerned Veterans, supra,* 675 F.2d at 1325.[14] No doubt, rates charged in the firm's prior representations *"may* afford relevant comparisons." *Blum, supra,* 104 S.Ct. at 1547 n. 11 (emphasis added). Nor do I question that in some, but by no means all, instances the applicant's customary billing practice will provide the "best evidence" of the market rate. *Concerned Veterans, supra,* 675 F.2d at 1325. But neither the policy underlying the attorney fees acts nor the precedent construing them support the suggestion that a private firm's billing rate is presumptively dispositive and that any incongruence between that rate and the fee award is a reversible error of law. Because, in my judgment, the District Court meticulously applied the correct standard, I would affirm its determination of reasonable hourly rates.

## II

I would also affirm the District Court's decision to adjust the lodestar to account for the risk of not prevailing. Were it my task to canvass the evidence *de novo* and fix an appropriate contingency multiplier, conceivably I would disagree with the determination below. But such is not my task, nor should it be. We may reverse an adjustment in the lodestar only if it constitutes an abuse of discretion. *Copeland, supra,* 641 F.2d at 893. This deferential standard is "appropriate" not only "in view of the district court's superior understanding of the litigation," but as well because of "the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley, supra,* 103 S.Ct. at 1941. Review under a more exacting standard encourages protracted appellate litigation, increases the uncertainty and expense of bringing a civil rights suit, and, in so doing, may well discourage other victims of civil rights violations from pressing their claims. *Id.* at 1951 (Brennan, J., concurring in part and dissenting in part). Purporting to apply the appropriately deferential standard, the majority finds a contingency adjustment inappropriate in this case. Because, however, the District Court indisputably applied the correct legal standard, carefully evaluated the substantial

---

**13.** The Supreme Court has made clear that it disfavors any approach to fee calculations that encourages litigants to pursue appellate review of the District Court's award. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983).

  In systemic terms, attorney's fee appeals take up lawyers' and judges' time that could more profitably be devoted to other cases, including the substantive civil rights claims that § 1988 was meant to facilitate. Regular appellate scrutiny of issues like those in this case also generates a steady stream of opinions, each requiring yet another to harmonize it with the one before or the one after. Ulti-

mately § 1988's straightforward command is replaced by a vast body of artificial, judge-made doctrine, with its own arcane procedures, which like a Frankenstein's monster meanders its well-intentioned way through the legal landscape leaving waste and confusion * * * in its wake. * * *

*Id.* at 1951 (Brennan, J., concurring in part and dissenting in part).

**14.** The court may consider the fee charged by the losing party's counsel. *See Swann v. Charlotte-Mecklenburg Board of Education, supra* note 3, cited in *Senate Report* and discussed in note 3 *supra.*

submissions on the issue, and fully articulated the basis for its determination, quite frankly I am at a loss to understand how the majority can conclude that the court below abused its discretion.

The majority's analysis is succinct. It reads *Blum, supra,* to suggest that contingency adjustments are proper only in "exceptional" cases and then finds the odds of success at the outset of this 14-year-old litigation not "unusual" enough to meet this standard. Maj. op. at 29. Distilling from *Blum* an "exceptional cases" test is no mean feat. *Blum,* as the majority recognizes elsewhere, explicitly declined to analyze the appropriateness of an upward fee adjustment to account for the risk of not prevailing. 104 S.Ct. at 1550 n. 17.[15] The Court did suggest that adjustments to reflect the *quality of representation* would be "exceptional" because that factor ordinarily would be subsumed by the reasonable hourly rate variable. *Id.* at 1549. But this reasoning does not apply to the quite different question of the contingency multiplier. Indeed, consistent with *Blum*'s concern to avoid "double counting," in *Concerned Veterans, supra,* 675 F.2d at 1328, we admonished the District Court *not* to include the risk premium in calculating the lodestar figure. The "exceptional cases" test fashioned by the majority thus finds no support in the prior decisions of the Supreme Court.[16]

After careful consideration the District Court found that the odds of success at the outset of the litigation were approximately even. 572 F.Supp. at 379. Provided only that the lodestar figure does not already subsume the risk of non-success, whether these odds may be deemed "exceptional" is irrelevant in calculating the contingency adjustment.[17] Congress made a deliberate judgment[18] to encourage litigants to press

**15.** The Court observed that the fee applicants had not asserted and had made no effort to document a claim that the riskiness of the suit warranted an upward adjustment in the fee. Accordingly, it found that the District Court had erred in relying on the prospects for success in the litigation in making its calculation. *Blum v. Stenson, supra* note 4, 104 S.Ct. at 1550.

**16.** While this case was pending another panel of this court did suggest that the contingency multiplier should be available only in "exceptional circumstances within the meaning of *Blum v. Stenson*." *Murray v. Weinberger, supra* note 10, 741 F.2d at 1431 (opinion by Wilkey, J.). *Murray*'s reliance on *Blum* mirrors that of the majority and, in my view, is equally incorrect. In any event, the holding of *Murray* is irrelevant to this case. Determining whether a case is "exceptional within the meaning of *Blum v. Stenson*" is, of course, difficult when the *Blum* court expressly eschewed discussion of the contingency factor. The only actual use of the word "exceptional" in the opinion refers to the extent of the plaintiff's success and provides no guidance at all in measuring the appropriateness of a contingency adjustment. *Blum v. Stenson, supra* note 4, 104 S.Ct. at 1548–1549. "[E]xceptional within the meaning of *Blum*" can only refer to the Court's repeated admonition that in weighing adjustments to the lodestar the District Court not engage in "double counting" by compensating the attorney for factors already included in the lodestar figure. Three times the *Blum* Court returned to the theme: "only in the rare case" will the "quality of service rendered"

not already be built into the reasonable hourly rate; "the novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel * * * [and the] reasonable hourly rate"; " 'results obtained' generally will be subsumed within other factors used to calculate a reasonable fee." *Id.* Although this interpretation effectively collapses the first and third factors listed in *Murray,* it is the only coherent way to extrapolate from *Blum*'s discussion of other lodestar adjustments an "exceptional circumstances" test applicable to the contingency factor.

In this case the District Court scrupulously and explicitly followed our suggestion in *Nat'l Ass'n of Concerned Veterans v. Secretary of Defense, supra* note 10, 675 F.2d at 1328, that the risk of non-success *not* be incorporated in the lodestar figure. *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 379 n. 50 (D.D.C.1983). The majority does not suggest otherwise. Therefore, the concern of the *Blum* Court and, derivatively, the *Murray* court embodied in the "exceptional circumstances" test has no bearing on this case.

**17.** The majority reasons that a 50% chance of success is the "norm for litigated cases—in the average case, one side will win, one will lose." Maj. op. at 29 (emphasis deleted). This is analogous to suggesting that on any given day the chances of rain are even—either it will rain or it won't.

**18.** At least two of the cases cited in *Senate Report* as applying the appropriate standard ad-

claims for violation of civil rights even where the chances of success are uncertain. The legislative decision to permit courts to make adjustments to compensate for the risk of not prevailing reflects the "experience of the marketplace that lawyers generally will not provide legal representation unless they receive a premium for taking that risk." Berger, *Court Awarded Attorney's Fees: What Is Reasonable?*, 126 U.PA.L.REV. 281, 325 (1977). No doubt, Congress did not intend to encourage suits even where the prospects of success are extremely remote.[19] But where, as here, the probabilities approached 50 percent, adjusting the lodestar to account for the prospect of large, uncompensated outlays of time and money is entirely consistent with—indeed, mandated by—the congressional design. *Blum, supra*, 104 S.Ct. at 1550–1551 (Brennan, J., concurring); E. LARSON, *supra*, at 215.

CONCLUSION

In *Copeland* this court, sitting *en banc*, recognized that the process of setting the lodestar figure and calculating adjustments is "inherently imprecise and that certain estimations must be made." 641 F.2d at 893. But for the policy reasons discussed above we concluded that the District Court was in the best position to determine the appropriate figure and that we would not second guess that judgment absent an abuse of discretion. In my view, the majority has done just that. Substituting its

justed the award to account for the risks incurred by the attorney. *See Stanford Daily v. Zurcher*, 64 F.R.D. 680, 682 (N.D.Cal.1974); *Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444 (C.D.Cal.1974). *See generally* E. LARSON, *supra* note 2, at 215 (proper use of the contingency factor fulfills the congressional design).

19. The majority draws a distinction between a "contingency multiplier" and a "contingency enhancement." I agree that the District Court's task goes beyond merely ascertaining the numerical probability of success at the outset of the litigation and multiplying the lodestar by the reciprocal of that figure. Congress did not make clear how much encouragement it wished to give suits of "varying degrees of promise," Leubsdorf, *The Contingency Factor in Attorney*

judgment for that of the District Court, the court today disregards this circuit's carefully crafted approach to civil rights attorney fees awards and, in so doing, frustrates the intent of Congress and injects unnecessary confusion into an area of law I had thought settled long ago.

Accordingly, I respectfully dissent.

*Fee Awards*, 90 YALE L.J. 473, 499 (1981), and I am reluctant to attribute to Congress the intent to encourage suits irrespective of the remoteness of the chance of success. *Id.* at 481. But the fact remains that Congress believed that effectuation of the civil rights laws required encouraging suits even where the prospects of success were uncertain. *See* note 15 *supra*. Thus it falls to the District Court to determine whether, measured from the outset of the litigation, the probabilities of success were of sufficient magnitude that providing the attorney with some incentive to take the case is consistent with the congressional design. Once having made this determination, the District Court must exercise its judgment as to how much monetary incentive the rational attorney would require to compensate for the risk of large, uncompensated outlays of time and money.